[No. S035265. Mar. 6, 1995.]

LEO ROSSI et al., Plaintiffs and Respondents.
THAD BROWN, as Tax Collector, etc., Defendant and Appellant.

## COUNSEL

Louise H. Renne, City Attorney, Burk E. Delventhal and Thomas J. Owen, Deputy City Attorneys, for Defendant and Appellant.

Jonathan M. Coupal, Trevor A. Grimm, Ronald A. Zumbrun, Anthony T. Caso, Alan W. Foutz, William M. Pfeiffer, Judith K. Herzberg, Spencer R. Kaitz, Jeffrey Sinsheimer, Nielsen, Merksamer, Parrinello, Mueller & Naylor, John E. Mueller and Eric J. Miethke as Amici Curiae on behalf of Defendant and Appellant.

Sal C. Balistreri and Michael Mendelson for Plaintiffs and Respondents.

James P. Botz, County Counsel (Sonoma), Lloyd M. Harmon, Jr., County Counsel (San Diego), Jeffrey L. Kuhn, County Counsel (Madera), Dwight L. Herr, County Counsel (Santa Cruz) and Sally Grant Disco as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**BAXTER, J.**—We are asked to decide whether, under a city charter which prohibits referenda on tax ordinances, but which grants to the electorate the power to adopt any legislation that the board of supervisors may enact, the initiative power may be used to prospectively repeal a tax ordinance and to prevent adoption by the board of supervisors of any future ordinance imposing a similar tax. The Court of Appeal held that use of the initiative power to repeal a tax and to bar future adoption of a tax had the same effect as a referendum on a tax ordinance and thus was prohibited.

We disagree. The rule on which the Court of Appeal relied, one based on dicta in prior cases, fails to take into account the plain language of the constitutional and charter provisions in which the people have reserved the powers of initiative and referendum. While the referendum provisions expressly preclude a referendum on statutes and ordinances which impose a tax, no such limitation is imposed on the people's exercise of their reserved initiative power.

The language of the constitutional and charter provisions in issue is clear. The initiative provisions, unlike the referendum provisions, do not except measures imposing a tax from the initiative power. In the absence of any ambiguity there is no need to look beyond the words of these documents to ascertain their meaning. As we shall explain, however, that history which is available supports our conclusion that the San Francisco ordinance which is the object of this proceeding was within the power of the people to adopt by initiative. That history confirms that the power of the people to control taxation was among the principal benefits of the initiative anticipated by its supporters.

Because the Court of Appeal erred in equating the initiative power with the referendum power and imposing on the initiative power a limitation not found in the language of the constitutional initiative provision or the San Francisco Charter, we shall reverse the decision of the Court of Appeal.

I

### BACKGROUND

In 1982 the Board of Supervisors of the City and County of San Francisco (the Board) enacted an ordinance which exempted residential utility users from a utility tax that had been imposed earlier on the use of electricity, gas, water, steam, and telephone service. The ordinance also provided, however,

that in succeeding years the tax would be imposed again unless the Board voted to exempt residential users by September 15 of the previous year.

When the Board reversed an earlier decision to exempt residential users for 1987, an initiative petition seeking to prospectively repeal the tax on residential users qualified for the ballot and was adopted at a November 1987 election. The initiative (Proposition R) added section 707.1 to the revenue/business regulations of the city. (Section 707.1.) Section 707.1 provided:

"(a) No tax shall be levied upon the use . . . by residential customers of telephone communication services, electrical energy or gas, water or steam which is delivered through mains or pipes or of any other utility service after June 30, 1988.

"· · · · · · · · · · · · · · · · · · · · ·

"(c) This Section was adopted by the voters of [the city] at the November 3, 1987 election and may be amended only by the vote of the electorate."

When appellant tax collector stopped collecting the tax after June 30, 1988, respondents, taxpayers Leo Rossi and Guiliano Darbe, filed this action, a petition for writ of mandate, by which they sought to compel appellant to resume collecting the utility tax from residential users. The superior court issued a peremptory writ of mandate granting the requested relief and tax collector appealed. The Court of Appeal affirmed the judgment. This court granted appellant's petition for review.

II

THE INITIATIVE POWER

This case arises because both the Charter of the City and County of San Francisco and section 9 of article II of the California Constitution exclude tax measures from the referendum power of the voters.[1] There is no express exclusion of tax measures from the initiative, however.

▪ Because the role of the court is to apply a statute or constitutional provision according to its terms, not to read into it exceptions or qualifications that are not supported by the language of the provision (*Vallerga v. Dept. Alcoholic Bev. Control* (1959) 53 Cal.2d 313, 318 [1 Cal.Rptr. 494, 347 P.2d 909]), we begin with what appears to be the plain language of the

---

[1] *All references to the Constitution are to the Constitution of California.*

constitutional and charter provisions which govern exercise of the initiative power in the City and County of San Francisco. Where the language is clear, it should be followed. (*Droeger* v. *Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 38 [283 Cal.Rptr. 584, 812 P.2d 931].)

■ These constitutional and charter provisions must be construed liberally in favor of the people's right to exercise the reserved powers of initiative and referendum. The initiative and referendum are not rights "granted the people, but . . . power[s] reserved by them. Declaring it 'the duty of the courts to jealously guard this right of the people' [citation], the courts have described the initiative and referendum as articulating 'one of the most precious rights of our democratic process' [citation]. '[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right not be improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it.' " (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473], fn. omitted; see also *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 241 [186 Cal.Rptr. 30, 651 P.2d 274].) We examine the constitutional and charter initiative provisions with these principles in mind.

Article II, section 8 of the Constitution creates the statewide initiative power. It provides in pertinent part:

"(a) The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them.

"(b) An initiative measure may be proposed by presenting to the Secretary of State a petition that sets forth the text of the proposed statute or amendment to the Constitution and is certified to have been signed by electors equal in number to 5 percent in the case of a statute, and 8 percent in the case of an amendment to the Constitution, of the votes for all candidates for Governor at the last gubernatorial election.

". . . . . . . . . . . . . . . . . . . . . . . . ."

■ The only express constitutional limitations on the people's exercise of the statewide initiative power are those in sections 8 and 12 of article II. Section 8, subdivision (d) of article II bars initiative measures "embracing more than one subject," and section 12 of that article bars constitutional amendments and statutes which "name[] any individual to hold any office, or

name[] or identif[y] any private corporation to perform any function or to have any power or duty . . . ."[2]

Nothing in the constitutional reservation of the initiative power expressly precludes exercise of the initiative to repeal a tax measure.

The local initiative power may be even broader than the initiative power reserved in the Constitution. (*Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605 [150 P. 977]; *Spencer* v. *City of Alhambra* (1941) 44 Cal.App.2d 75, 78 [111 P.2d 910].) In *Spencer*, the power of the voters to establish by initiative the minimum salaries for policemen was in issue. The city charter gave to the city commission the authority to establish those salaries, but in a separate provision the voters had reserved a very broad initiative power. " 'The qualified electors of the city shall have power through the initiative or otherwise, as provided by this chapter and the general laws of the state, to enact appropriate legislation to carry out and enforce any of the general powers of the city or any of the specified powers of the commission.' " (44 Cal.App.2d at p. 78, italics omitted.) That reservation, the court held, overrode the commission's power.

"When . . . the people phrased the foregoing sections pertaining to those powers in such broad, general and unambiguous language, the conclusion seems inevitable that thereby it was intended that legislation on every municipal subject should, unless expressly or by clear and necessary implication excluded by other sections, be subject to initiative actions through the adoption of ordinances by the people. After all, the people through their charter have a right to vest in the voters of the city the right and power to deal through initiative action with any matter within the realm of local affairs or municipal business, whether strictly legislative or not, as that term is generally used (*Hopping* v. *City of Richmond*, 170 Cal. 605 [150 Pac. 977]); and . . . the consensus of authority is to the effect that the fixing of salaries of public officers is a legislative function." (*Spencer* v. *City of Alhambra, supra*, 44 Cal.App.2d 75, 78-79.) "[T]he charter . . . has reserved to the electors the broadest possible powers in the matter of initiative

---

[2]Once adopted, unless the measure otherwise provides, an initiative statute may be amended or repealed only by a statute approved by the voters. Although the initiative power is broad, "[a] statutory initiative is subject to the same state and federal constitutional limitations as are the Legislature and the statutes which it enacts." (*Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 674 [194 Cal.Rptr. 781, 669 P.2d 17]; see also *Barlotti* v. *Lyons* (1920) 182 Cal. 575 [189 P. 282].) The power is limited to enactment of statutes and amendment of the Constitution (*American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687, 694 [206 Cal.Rptr. 89, 686 P.2d 609]) and may not be used to control the internal operation of the Legislature. (*People's Advocate, Inc.* v. *Superior Court* (1986) 181 Cal.App.3d 316, 327 [226 Cal.Rptr. 640].)

legislation; powers so extensive as to permit adoption by the voters of any ordinance the commission might enact . . . as well as to carry out and enforce any of the general powers of the city or any of the specified powers of the commission." (*Id.* at p. 80; see also *Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 374 [71 Cal.Rptr. 687, 445 P.2d 303].)

The reserved initiative power of the San Francisco electorate is also extremely broad.[3] Section 9.108, subdivision (a) of the charter provides: "The registered voters shall have the power to propose by petition, and to adopt or to reject at the polls, *any ordinance, act or other measure which is within the power conferred upon the board of supervisors to enact,* or any legislative act which is within the power conferred upon any other board, commission or officer to adopt, or any amendment to the charter." (Italics added.)

Thus it appears that under the plain language of charter section 9.108, subdivision (a), the voters of the City and County of San Francisco had the power to add section 707.1 to the revenue/business regulations of the city.

### III

### THE REFERENDUM POWER

■ The referendum, by contrast, applies only to newly enacted legislation and is subject to express constitutional limitations, among which is the exemption of tax measures from referendum. When a referendum petition qualifies, the newly enacted measure does not become effective and may not be implemented until it is approved by the voters. (*Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638, 654-657 [180 Cal.Rptr. 297, 639 P.2d 939].) Both the Constitution and the San Francisco Charter exempt legislation imposing taxes from the power of referendum.

---

[3]California was the 10th state to adopt the initiative and referendum. (Eu, A History of the Cal. Initiative Process (1988) p. 2.) The Legislature and the electorate revised the California Constitution in 1911 to reserve to the people the right to amend the Constitution, to enact statewide legislation, and to prevent acts of the Legislature from becoming law. Article IV, section 1 of the Constitution provides: "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the powers of initiative and referendum."

San Francisco, already a charter city, had revised its charter in 1898 to provide for the initiative and referendum. (Key & Crouch, The Initiative and Referendum in Cal. (1938) p. 428.) A constitutional amendment adopted in 1902, before the statewide initiative and referendum provisions were added to the Constitution, permitted home rule cities to amend their charters by initiative. (See now art. XI, § 3, subds. (b) & (c): "(b) The governing body or charter commission of a county or city may propose a charter or revision. Amendment or repeal may be proposed by initiative or by the governing body. (c) An election to determine whether to draft or revise a charter and elect a charter commission may be required by initiative or by the governing body.")

Article II, section 9, subdivision (a) of our Constitution provides: "The referendum is the power of the electors to approve or reject statutes or parts of statutes *except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State.*" (Italics added.)

The constitutional provisions which address local government, found in article XI, do not deal with the local referendum power other than to provide that where the governing body of a county prescribes compensation for its members by ordinance, the ordinance is subject to the referendum. (Const., art. XI, § 1, subd. (b).) The restrictions found in article II, section 9, are applicable to local referenda, however, except to the extent that charter cities are exempted. (*Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 836-837 [313 P.2d 545]; but see *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1, 22 [2 Cal.Rptr.2d 490, 820 P.2d 1000] (conc. opn. of George, J.).)[4]

■ As is true of the local initiative power, a charter may reserve a broader referendum power to the voters. " 'The constitutional reservation goes to the full extent expressed by its language. If the charter differs from the constitution in any respect it does not thereby diminish the powers reserved by the constitution. On the other hand, if the powers reserved by the charter exceed those reserved in the constitution the effect of the charter would be to give to the people the additional powers there described.' [Citations.] In other words, as between the provisions of the Constitution and the provisions of a city charter, those which reserve the greater or more extensive referendum power in the people will govern." (*Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 622-623 [191 P.2d 426].)

Like the Constitution, the San Francisco Charter prohibits exercise of the referendum power over tax and appropriation measures. Section 9.108 of the charter provides: "Annual budget and appropriation ordinances, supplemental appropriation ordinances, the annual salary ordinance, or ordinances amending the same, the ordinances levying taxes, . . . shall not be subject to referendum."

---

[4]The constitutional limitation on the power of the Legislature to prescribe procedures for exercise of the local initiative and referendum powers insofar as charter cities are involved (Const., art. II, § 11) recognizes the sweeping self-governing authority granted to charter cities by sections 3 and 5 of article XI. Under subdivision (a) of article XI, section 3, charter provisions "are the law of the State and have the force and effect of legislative enactments." The scope of the initiative and referendum powers, even in charter cities, is limited to control over municipal affairs. The state has plenary authority over matters of statewide concern and, in areas in which the Legislature has specifically and exclusively delegated authority in those matters to a local legislative body, may bar exercise of either referendum or initiative. (*Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 511-512 [247 Cal.Rptr. 362, 754 P.2d 708].)

Both the charter and the Constitution, therefore, preclude referenda on tax measures. The Court of Appeal reasoned that use of the initiative power to repeal a tax measure was the equivalent of subjecting the ordinance imposing the tax to referendum, an impermissible use of the referendum. The tax collector argues that the court erred in that conclusion, and in relying on dicta in prior decisions which reached the same conclusion. We agree.

## IV

### THE INITIATIVE AND TAXATION

As we have noted above, the history of the constitutional initiative provision makes it clear that the limitation on the referendum power, which excludes tax-related matters, does not extend to the use of the initiative to repeal taxes prospectively. When the statewide initiative power was added to the Constitution in 1911 as part of newly adopted article IV, section 1, taxation was not only a permitted subject for the initiative, but was an intended object of that power. The history of the measure, which confirms this intent,[5] is found in contemporary understanding of article IV, section 1, and statements made by the drafter and leading proponent of the initiative and referendum measures, Dr. John Haynes, who had earlier been successful in causing those powers to be added to several city and county charters.

The contemporary understanding[6] is reflected in unsuccessful attempts made in 1917 to amend the initiative provision to exclude measures related to taxation, an amendment that would have been unnecessary if tax-related measures were not permissible subjects of the initiative. When that failed, unsuccessful attempts were made in 1919, 1920, and 1922, to increase the

---

[5]While purporting to construe the initiative power in a manner that would effectuate the intent underlying the initiative and referendum, the dissent studiously ignores or is unpersuaded by a history which refutes the argument that the initiative may not be used in tax-related matters where the referendum is not available.

[6]Contemporary construction of an ambiguous statute or constitutional provision may be considered if it sheds light on the intent underlying the measure. (*Robinson* v. *Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 237 [5 Cal.Rptr.2d 782, 825 P.2d 767]; *Quinn* v. *State of California* (1975) 15 Cal.3d 162, 173 [124 Cal.Rptr. 1, 539 P.2d 761].) The "contemporary construction" of a statute to which the court looks in an attempt to ascertain legislative intent is not limited to that applied simultaneously with the enactment of the measure. A consistent application of a statute for many years after its enactment may also be looked to as contemporaneous construction. (See, e.g., *First Nat. Bank* v. *Kinslow* (1937) 8 Cal.2d 339, 346 [65 P.2d 796].)

Although the initiative and referendum provisions under consideration here are not ambiguous, and thus we need not rely on extrinsic sources to ascertain their meaning, those sources which are available confirm that the drafters of those provisions understood and intended the difference between them that is reflected in the omission of any subject matter limitation on the exercise of the initiative power.

required signatures for tax-related initiative measures to a level that would have made qualification of such petitions next to impossible. Again, those efforts would have been unnecessary if the initiative could not be used to enact and repeal tax legislation.

The subject matter of initiative measures was not addressed in the ballot pamphlet for Senate Constitutional Amendment No. 22, the initiative/referendum measure proposed in 1911. Statements made by Dr. Haynes and the Direct Legislation League, which he founded, about the purpose of the initiative are particularly instructive, however, because Dr. Haynes and the Direct Legislation League had persuaded the Legislature to propose the 1911 constitutional amendment. (Key & Crouch, The Initiative and Referendum in Cal., *supra*, pp. 429-440.) The secretary of the league was one of the three persons, the others being members of the Senate and Assembly, who revised the draft of Senate Constitutional Amendment No. 22 prior to introduction in either house. The original draft had been drawn up by a committee appointed by the Chairman of the Republican State Platform Committee. (Hichborn, Story of the Session of the Cal. Legislature of 1911 (1911) p. 95.)[7]

The 1917 measure (Senate Constitutional Amendment No. 12) proposed to bar use of the initiative as well as the referendum for tax and assessment legislation. The amendment would have provided that neither could "be used to enact or annul any law providing any method of assessment, or for the levy of any tax in this State." Senate Constitutional Amendment No. 12 was introduced in response to a failed single tax initiative that would have amended article XIII of the Constitution to limit taxation to that assessed on

---

[7]The intent of an individual lawmaker or proponent of a statute will not be considered by the court because there is no assurance that those views were shared by other legislators who favored the measure. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371]; *McGlothlen* v. *Department of Motor Vehicles* (1977) 71 Cal.App.3d 1005 [140 Cal.Rptr. 168].) When construing constitutional provisions and initiative measures, however, the intent of the drafters may be considered by the court if there is reason to believe that the electorate was aware of that intent (*Taxpayers to Limit Campaign Spending* v. *Fair Political Practices Com.* (1990) 51 Cal.3d 744, 764-765, fn. 10 [274 Cal.Rptr. 787, 799 P.2d 1220]) and we have often presumed, in the absence of other indicia of the voters' intent such as ballot arguments (see *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245, 250 [279 Cal.Rptr. 325, 806 P.2d 1360]) or contrary evidence, that the drafters' intent and understanding of the measure was shared by the electorate. (See, e.g., *Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327, 364, fn. 20 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *People* v. *Castro* (1985) 38 Cal.3d 301, 312 [211 Cal.Rptr. 719, 696 P.2d 111]; *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 462 [343 P.2d 8].) The historic context in which a measure is drafted is also relevant in construing the 1911 amendments which added the initiative, referendum, and recall to the Constitution. We have found the views of Franklin Hichborn, a contemporary observer of the 1911 and subsequent legislative sessions, to be particularly illuminating. (See *Taxpayers to Limit Campaign Spending* v. *Fair Political Practices Com., supra*, 51 Cal.3d 744, 767.)

land values, and would have repealed existing tax authority and all taxes imposed pursuant to the existing authority. (Key & Crouch, The Initiative and Referendum in Cal., *supra*, pp. 557-558.)

The Direct Legislation League stated in a letter to the sponsor of Senate Constitutional Amendment No. 12 that the measure "takes away from the people the most important right of self-government which they possess, namely: *the power of control over taxation.* This strikes at the very root of popular self-government. Practically all historic struggles for liberty, including the English Revolution, the French Revolution and our own American Revolution, have centered about the question of *the people's control over taxation.*" (Hichborn, Story of the Session of the Cal. Legislature of 1921 (1922) p. 189, fn. 145, italics added.)

In 1919, Senate Constitutional Amendment No. 5 was introduced in the Legislature in an attempt to limit use of the initiative for tax measures by increasing the number of signatures necessary to qualify an initiative petition from 8 percent to 25 percent of the voters. Dr. Haynes said in opposition: "Again, if they can destroy the people's *use of the initiative in the most important function, taxation,* it will be the beginning of efforts which will lead to the destruction of the entire initiative power of the people." The bill failed in the Legislature. (Hichborn, Story of the Session of the Cal. Legislature of 1921, *supra*, at p. 190, italics added.)

After the Legislature defeated the proposal to place Senate Constitutional Amendment No. 5 on the ballot in 1919, the measure was placed on the ballot as an initiative constitutional amendment in 1920 and defeated. The League to Protect the Initiative was formed by Dr. Haynes at that time as a reorganization of the Direct Legislation League. Its aim was " 'to defeat the proposed amendment to the initiative law which seeks to destroy the *power of the people to initiate laws pertaining to the assessment and collection of taxes.*' " (Hichborn, Story of the Session of the Cal. Legislature of 1921, *supra*, at p. 201.) A majority of the 30 votes in Alpine County favored the proposal. The measure was defeated in all other counties. A subsequent attempt to increase the number of signatures required to qualify an initiative petition to 15 percent failed in 1922. The League to Protect the Initiative issued a pamphlet at that time stating that with the increase "only powerful organizations and interests could use the initiative in *questions relating to the assessment or collection of taxes . . . .*" (The Initiative and Referendum in Danger! (League to Protect the Initiative, pamp. 1922) p. 1, italics added.) Dr. Haynes said then that the purpose of the measure (Proposition 7) was the desire of the proponents *"to get sole control of taxation"* by making it "impossible for the people as a whole to secure that number of signatures." (Tallinn, Direct Democracy (1977) p. 41, italics added.)

Both the efforts to amend the initiative provision of the Constitution to exclude matters related to taxation and those to make it more difficult to use the initiative in tax matters reflect the understanding of the Legislature and the proponents of the initiative at the time of its adoption that there is no restriction on the use of the initiative in the area of taxation. The electorate could use the initiative process to prospectively adopt or annul (repeal) statutes imposing taxes notwithstanding the limitation on the use of the referendum power to reject statutes imposing taxes.[8]

The San Francisco Charter provision in issue in this case, which is broader than the 1898 version, was added to the charter in 1911 (Stats. 1911, Conc. and Joint Res., ch. 25, pp. 1670-1679) by the same Legislature which put the statewide initiative, referendum, and recall measures on the ballot. Since the local power may not be restricted to less than that constitutionally authorized, the Legislature presumably intended that the San Francisco Charter also authorize use of the initiative to repeal a tax ordinance.

To understand why neither the Constitution nor the San Francisco Charter includes an exemption for tax measures in the provisions governing the initiative, while the referendum provisions do exempt tax measures, an understanding of the impact of the referendum on governmental operation, and how the initiative differs, is essential.

---

[8]Since 1911, the statewide initiative power has been invoked for these statutory tax-related matters: 1918—Proposition 18, a proposal to limit school taxes; 1924—Proposition 1, a proposal to tax gross receipts of highway transportation companies; 1926—Proposition 4, a proposal to impose taxes on distributors of motor vehicle fuels; 1958—Proposition 17, a proposal to reduce sales and use tax rates and limit the authority of the Legislature over income tax rates; 1982—Proposition 6, a proposal to repeal gift and inheritance taxes and ban future state or local gift and inheritance taxes; 1982—Proposition 7, a proposal for income tax indexing; 1986—Proposition 62, a proposal to require voter approval for increases in local taxes and ban collection of higher taxes adopted after July 31, 1985, unless approved by the voters; 1988—Proposition 99, a proposal to increase taxes on tobacco products; 1990—Proposition 133, a proposal to increase sales taxes and allocate revenues raised to the Safe Streets Fund; 1990—Proposition 134, a proposal to impose surtaxes on alcoholic beverages and allocate revenues raised to the Alcohol Surtax Fund; 1991—Proposition 163, a proposal to exempt certain items from sales and use taxes (and amend the Constitution to prohibit taxes on food); 1991—Proposition 167, a proposal to reduce sales tax rates, exempt certain items from sales tax, and apply highest income tax rates to more persons.

The San Francisco Charter initiative power has also been exercised in tax-related matters from the time the power was created. The first instance was at the November 7, 1905, election at which an initiative ordinance to raise the saloon license tax to $500 was on the ballot. It was defeated, but the board of supervisors then adopted an ordinance to do so. In 1907 an initiative ordinance which would have reduced the liquor license fee was defeated. In 1909 the retail liquor dealers submitted an initiative ordinance retaining the license tax, but precluding any amendment by the board of supervisors and exempting wholesale liquor dealers from the fee. In 1910 a playground tax initiative was defeated.

The constitutional and charter exemptions from the referendum (statutes and ordinances calling elections, levying taxes, appropriating funds for current expenses, and other "urgency" measures) are measures having special urgency, a delay in the implementation of which could disrupt essential governmental operations. County ordinances fixing the amount of money to be raised by taxes and those fixing the tax rate therefore go into effect immediately, while the effective date of other ordinances is delayed. (Elec. Code, §§ 9141-9143.) When a referendum petition qualifies prior to the effective date of a county ordinance, the ordinance is suspended pending reconsideration and repeal of the ordinance by the board of supervisors or submission of the measure to the voters at a regular or special election. The ordinance does not become effective unless and until a majority of the voters approves it at the referendum election. (Elec. Code, §§ 9144, 9145.) Therefore, if a tax measure were subject to referendum, the county's ability to adopt a balanced budget and raise funds for current operating expenses through taxation would be delayed and might be impossible. As a result, the county would be unable to comply with the law or to provide essential services to residents of the county.

For that reason, when taxes levied to support essential governmental services arguably are involved in a referendum, the general rule requiring that referendum provisions be liberally construed to uphold the power is inapplicable. "If essential governmental functions would be seriously impaired by the referendum process, the courts, in construing the applicable constitutional and statutory provisions, will assume that no such result was intended. [Citations.] One of the reasons, if not the chief reason, why the Constitution excepts from the referendum power acts of the Legislature providing for tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with the administration of its fiscal powers and policies." (*Geiger* v. *Board of Supervisors, supra,* 48 Cal.2d at pp. 839-840.)

We concluded in *Geiger, supra,* that the same reasoning applied to referenda directed to acts of a county board of supervisors. Managing the county government's financial affairs, we reasoned, was entrusted to elected representatives, and was an essential function of the board which could not accurately estimate income if tax ordinances were subject to referenda. (48 Cal.2d at p. 840.)

An initiative has no immediate impact, however. Passage of an initiative which repeals an existing tax will rarely affect the current budgetary process of a local government. The San Francisco regulation in dispute expressly did not do so. Moreover, local officials have ample notice of the potential impact

of an initiative long before the measure can become effective. An initiative is proposed by petition submitted to the board of supervisors (Elec. Code, § 9102), but notice of an intent to circulate the petition for signature must be published before it may be circulated. (Elec. Code, § 9105, subd. (b).) The petition must qualify by gathering the required signatures within 180 days after the receipt of the title and summary. (Elec. Code, § 9110.) Within 30 days of filing the petition, if the petition is found sufficient, the election's official certifies the result to the board at its next meeting (Elec. Code, §§ 9114, 9115), at which time the supervisors must either pass the proposed ordinance as provided or place the ordinance on the ballot at a special election or the next statewide election. (Elec. Code, §§ 9116-9118.) Even those initiatives that qualify for a special election may not actually be voted on for as long as four, and in some cases six, months after the proposed ordinance is presented to the supervisors. (Elec. Code, § 9117.) Therefore, the potential for disruption of local government services by qualification of a referendum petition on a newly enacted tax measure is not present in the procedures leading to possible passage of an initiative which prospectively repeals an existing tax.

Moreover, as we held in *Hunt* v. *Mayor & Council of Riverside, supra,* 31 Cal.2d 619, 622-623, a city charter may not restrict the broad power of initiative and referendum granted by the Constitution. The history of the statewide initiative confirms that it was the intent of the electorate that the initiative be used to repeal a tax. In the most recent case to consider the use of the statewide initiative power to repeal a tax, *Carlson* v. *Cory* (1983) 139 Cal.App.3d 724, 731 [189 Cal.Rptr. 185], the court affirmed the people's power. In *Carlson,* the validity of initiative statutes which repealed the state's inheritance and gift tax laws was challenged on the ground that the measures interfered with the Legislature's power over taxation, a power that was claimed to be supreme. The Court of Appeal rejected that argument, holding that there was no constitutional limitation on the people's exercise of the initiative and this power was greater than that of the Legislature. "This reservation of power by the people is, in the sense that it gives them the final legislative word, a limitation upon the power of the Legislature." (*Id.,* at p. 728.) The constitutional grant of authority to the Legislature to pass laws regarding taxation of property did not, the Court of Appeal held, limit the people's plenary power of initiative, and that power may be used to repeal a tax.

That conclusion is consistent with the history of the statewide initiative. Inasmuch as the statewide initiative may be used to repeal a tax, initiative power granted by the San Francisco charter may be no less. (*Hunt* v. *Mayor & Council of Riverside, supra,* 31 Cal.2d 619, 622-623.) And, as we have

shown, the initiative power granted in the charter is at least as broad as the statewide initiative power.[9]

The parties agree that the Board has the power to repeal the residential utility tax. Even though the Board has the power to repeal the tax, and the electors of San Francisco reserved to themselves the power to enact any legislation within the authority of the Board, the Court of Appeal held in this case that local taxes may not be repealed by a local initiative measure. Notwithstanding the great difference in impact between a referendum on a newly passed tax ordinance and an initiative tax repeal, the court held that the power of the initiative does not extend to the conducting of what it believed amounts to a referendum on a tax previously imposed by a local legislative body. The court reasoned that neither initiative nor referendum may curtail a local legislative body's power of taxation. Relying on a line of decisions stemming from *Myers* v. *City Council of Pismo Beach* (1966) 241 Cal.App.2d 237 [50 Cal.Rptr. 402] (*Myers*), the Court of Appeal concluded that this is a "settled rule."

V

THE "*MYERS* RULE"

Appellant contends that *Myers* and subsequent decisions on which the court also relied, *City of Atascadero* v. *Daly* (1982) 135 Cal.App.3d 466 [185 Cal.Rptr. 228]; *Gibbs* v. *City of Napa* (1976) 59 Cal.App.3d 148 [130 Cal.Rptr. 382]; *Campen* v. *Greiner* (1971) 15 Cal.App.3d 836 [93 Cal.Rptr. 525]; and *Dare* v. *Lakeport City Council* (1970) 12 Cal.App.3d 864 [91 Cal.Rptr. 124], do not support the broad rule stated by the Court of Appeal. We agree both because the history of the state and local initiative and referendum powers reflects an understanding and intent that legislation not subject to referendum may be repealed by initiative and because the decisions which suggest that the initiative may never be used to repeal a tax, statute, or ordinance do so for the most part only in dicta.

■ Whether the rule invoked by the Court of Appeal here—that an initiative may not be used to legislate in areas where the voters have no right to the referendum—is sound is a question of first impression in this court. The rule, which finds its origin in *Myers,* has been applied in several subsequent cases. As the Court of Appeal noted in *Carlson* v. *Cory, supra,*

[9]Were we to conclude that the initiative power could not be used when the referendum is barred, we would have to conclude that this limitation extends to other matters not subject to referendum. If so, no legislation enacted as an urgency matter could ever be repealed by initiative since urgency matters are not subject to referendum.

139 Cal.App.3d 724, 731, however, "[t]his [*Myers*] 'rule,'. . . has never been approved by our Supreme Court, and in almost all of the above-cited cases, was merely dictum. We read those cases, not for the proposition [that the initiative may not be used where the referendum process is not available], but for the settled rule that neither the initiative nor the referendum may be used in a manner which interferes with a local legislative body's responsibility for fiscal management."

*Myers* dealt with an attempt to compel the city council of a general law city[10] to adopt or, if it declined to do so, to call a special election on, an initiative ordinance which if adopted would have barred enactment by the city council of a room occupancy tax.[11] The city council refused to enact the proposed ordinance or call an election in the matter. Instead it proceeded to enact an ordinance imposing such a tax. Because the ordinance proposed in the initiative petition would have expressly repealed any existing ordinance which conflicted with its provisions, adoption of the initiative would have repealed the room occupancy tax ordinance.

The Court of Appeal held that the proposed ordinance was not a proper subject for the initiative. Recognizing that municipal corporations have only the taxing power conferred on them by the Constitution or statute, the Court of Appeal emphasized that, as a general law city, Pismo Beach derived its power to tax from the state Constitution which at that time granted the Legislature the power to vest municipalities with authority to assess and collect taxes for municipal purposes. The Legislature had exercised that authority by conferring on "the legislative body" of cities and counties the power to levy a room occupancy tax. (Gov. Code, former § 51030; see now Rev. & Tax. Code, § 7280.) That being so, the legislative body could neither delegate, nor permit the electorate to usurp, that taxing power. (241 Cal.App.2d at p. 242.)

In dictum unsupported by authority, the *Myers* court then said: "A proposed initiative ordinance cannot be used as an indirect or backhanded technique to invoke the referendum process against a tax ordinance of a general law city . . . ." (*Myers, supra,* 241 Cal.App.2d 237, 243.)

---

[10]For a comprehensive explanation of the powers of a charter city as distinguished from a general law city, see *Johnson* v. *Bradley* (1992) 4 Cal.4th 389 [14 Cal.Rptr.2d 470, 841 P.2d 990]. Briefly, a charter city enjoys home rule or self-governance, and is subject to the general laws enacted by the Legislature only when the object of the legislation is a matter of statewide concern as opposed to a municipal concern.

[11]An initiative power which requires that a proposed ordinance or statute first be presented to the legislative body, and then, if not adopted, to the voters, is termed an "indirect" initiative. (See *City of Atascadero* v. *Daly, supra,* 135 Cal.App.3d 466, 468, fn. 3, see also Key & Crouch, *op. cit. supra,* appen. III, foll. p. 589, fn. e.)

The court made it clear in *Myers* that its holding was one limited to a general law city in which the Legislature had vested authority over taxation exclusively in the legislative body and in which the initiative power may not exceed that reserved in the Constitution. (241 Cal.App.2d at pp. 243-244.) Subsequent decisions have extended the reasoning of *Myers* to charter cities, however, without recognizing the distinctions between the initiative and referendum powers. Those decisions which suggest that *any* initiative tax repeal is simply a "backhand" referendum fail to acknowledge that the immediate impact on current revenues occasioned by a referendum is absent when an initiative repeals a tax, or that a specific legislative grant of authority to tax in a general law city was in issue in *Myers*. In so doing they have overlooked the source of the authority to tax for municipal purposes which, in a charter city, is derived from the home rule provisions of article XI, section 5, subdivision (a) (*Weekes* v. *City of Oakland* (1978) 21 Cal.3d 386, 392 [146 Cal.Rptr. 558, 579 P.2d 449]), and has no restriction comparable to the statute on which the *Myers* court relied.[12]

In only one of the cases which cites the *Myers* rule was a restriction on the initiative power arguably justified and that is because the initiative sought to accomplish the repeal of an ordinance where there would be an impact on funding the current expenses of the city government. *Campen* v. *Greiner*, *supra*, 15 Cal.App.3d 836, like the instant case, did involve a charter city and an initiative attempt to both repeal a residential utility tax and bar any future imposition of such a tax. The tax which had been imposed by the City Council of San Jose was for the stated purpose of providing revenue for the *usual and current* expenses of the city. After the city council placed the initiative measure on the ballot, the Court of Appeal granted a petition for writ of mandate compelling the city clerk to remove the measure.

The San Jose City Charter provided only that "[t]he powers of initiative, referendum and recall of elected municipal officers are hereby reserved to the electors of the City." The Court of Appeal cited *Myers* in holding that an

---

[12]Amicus curiae, the Association of County Supervisors, argues that local taxation has become a matter of statewide concern because the revenue it raises is necessary if counties are to carry out state-mandated functions and services. On that basis it contends that a local ordinance which limits the taxing power of the legislative body conflicts with state law. Therefore, state law preempts the local initiative in this area. It identifies no indicia of legislative intent to preempt the local initiative, and we will not presume such intent. The City and County of San Francisco has not entered this case and does not claim that regulation section 707.1 has such a drastic impact on its ability to fulfill its state-mandated functions. We have no occasion here to consider what recourse, if any, a county has if the electorate so restricts its taxing power that it cannot do so.

Similarly, we have no occasion here to consider the scope of the initiative power and its use to repeal tax ordinances in a general law city in which the governing body derives its taxation powers from the Legislature.

initiative may not be used as a "backhand" referendum where the referendum is not available. The basis for decision was that repeal by initiative of a tax ordinance during the fiscal year for which it was to provide current revenue would conflict with provisions of the city charter which imposed fiscal responsibility for municipal affairs on the city council. Those provisions, which provided for adoption of an annual budget based on a complete financial plan for operation of the city, required a plan for sources of income as well as expenditures. The budget could be adopted only after a public hearing, and when adopted was followed by an appropriation ordinance which took effect immediately. An initiative repealing that tax ordinance would necessarily invalidate or modify the budget, and would, therefore, conflict with the charter provisions governing the budgetary process. The court acknowledged that the people could limit the taxing power or expand the power of initiative and referendum as related to the taxing power, but held that the power granted the city council to manage the city could not be limited or impaired by repeal of a tax that had been levied for current general purposes. (*Campen* v. *Greiner, supra,* 15 Cal.App.3d at p. 843.)

The other cases relied on by the Court of Appeal here are all distinguishable. In some the actual basis for decision was that the power sought to be exercised by the voters in the initiative measure was one expressly delegated and limited to the governing body of the city.

The earliest of the post-*Myers* decisions relied on by the Court of Appeal, *Dare* v. *Lakeport City Council, supra,* 12 Cal.App.3d 864, did not involve a charter city or repeal of a tax. The disputed initiative would have amended a city ordinance to fix the maintenance fees charged users for operation of the municipal sewage system. The court cited the *Myers* rule in dictum. The holding, however, was that the initiative was not available to amend the ordinance in question because the Legislature had vested the local legislative body with the power to fix those fees. (12 Cal.App.3d at p. 869.)

*Gibbs* v. *City of Napa, supra,* 59 Cal.App.3d 148, relied on the *Myers* rule, but did so in a wholly different context. There, a proposed initiative would have barred expansion of a planned urban redevelopment area and declared that once that project was completed there was no further need for the local redevelopment agency to continue to function. The Court of Appeal held that because adopting redevelopment plans was an executive, not a legislative, function of the council, the adoption of a plan was not subject to referendum. Therefore, an initiative could not be used to block the plan. Although the court cited the *Myers* rule, the decision actually turned on the fact that the

initiative sought to intrude into what was then described as an administrative,[13] rather than the legislative, sphere. An alternate ground of decision, moreover, was that in redevelopment matters the council functioned as an administrative arm of the state, and thus its actions were beyond the reach of both the local initiative and the referendum power. (59 Cal.App.3d 148, 154.)

Any doubts with respect to the right of the people to adopt legislation governing taxes through the initiative process should have been laid to rest by the decisions of this court in *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization, supra,* 53 Cal.3d 245, and of the Court of Appeal in *Carlson* v. *Cory, supra,* 139 Cal.App.3d 724. In *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization, supra,* 53 Cal.3d 245, we upheld an initiative statute increasing the tax on tobacco products. We rejected a claim that an initiative statute was subject to the requirement imposed by section 3 of article XIII A of the Constitution that taxes imposed for the purpose of increasing revenue be passed by a vote of two-thirds of the members of each house of the Legislature. We reasoned that this could not have been the intent of the electorate which adopted article XIII A, an initiative constitutional amendment, since the Constitution itself could have been amended to achieve the same result by a simple majority vote. It would make no sense therefore to conclude that the people intended to limit their power of initiative in the manner suggested. As Justice Mosk noted there, "if a tax increase is permissible through the initiative process, a tax decrease would also be upheld." (53 Cal.3d at p. 256 (conc. opn. of Mosk, J.).)[14]

We conclude therefore that the *Myers* dicta to the effect that the initiative may never be used to accomplish repeal of an ordinance that may not be subjected to referendum is not sound and should not have been relied on by the Court of Appeal here.

The Court of Appeal also relied on a more recent series of cases decided subsequent to *Carlson* v. *Cory, supra,* 139 Cal.App.3d 724, 731. Those decisions, the Court of Appeal concluded, establish a rule barring use of the local initiative power in a manner which interferes with the responsibility of the local legislative body for fiscal management, a responsibility which reposes control over taxation solely in the legislative body. None of those cases is comparable to this one, however, since none involved an initiative repeal of a tax ordinance that is prospective only, i.e., would not affect the current budget of the city or county.

---

[13]See *Committee of Seven Thousand* v. *Superior Court, supra,* 45 Cal.3d 491, 511.

[14]It would be ironic, indeed, if the Constitution reserved the power to increase taxes to people wishing to do so, but withheld from the people the power to decrease taxes.

*City of Atascadero* v. *Daly, supra,* 135 Cal.App.3d 466, relying on *Myers,* held invalid a proposed initiative which, by defining "special taxes" to encompass a variety of revenue raising measures, would have required that any revenue-raising measure be approved by the voters before being implemented. It was invalid, the court held, because it interfered with the city council's authority over taxation. Again, however, a rejection of the tax by the voters would have been immediate, and would not be postponed to the next budgetary cycle as is the case here.

*Community Health Assn.* v. *Board of Supervisors* (1983) 146 Cal.App.3d 990 [194 Cal.Rptr. 557], addressed a challenge to an initiative measure that would have limited the ability of a county board of supervisors to impose license and permit fees, charges, and assessments within the county. The court found the initiative ordinance indistinguishable from that invalidated by the court in *City of Atascadero* v. *Daly, supra,* 135 Cal.App.3d 466. The same is true of *Fenton* v. *City of Delano* (1984) 162 Cal.App.3d 400 [208 Cal.Rptr. 486].[15]

In *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 143 [130 Cal.Rptr. 465, 550 P.2d 1001], we recognized that prior decisions reflected a policy of resolving doubts as to the scope of initiatives and referenda to avoid interference with the legislative body's responsibility for fiscal management, but also cautioned that speculative consequences of an initiative ordinance on the local tax base do not establish such interference. (*Id.,* at pp. 143-144.) ■ Therefore, it cannot be assumed that every initiative which repeals a tax will impermissibly interfere with fiscal management. An initiative may do so if the repeal eliminates a major revenue source and no other revenue source is available that may be tapped to offset a resulting budget deficit or to avoid future deficits. As appellant notes, Proposition R, the San Francisco initiative, was not to take effect immediately and did not eliminate a current revenue source. The current budget was not affected, and the record does not support a conclusion that the initiative had a substantial impact on the ability of the Board to manage the fiscal affairs of the City and County of San Francisco in subsequent years. That Board has not entered this case or opposed in any way appellant tax collector's efforts to uphold the voters repeal of the residential utility tax.

We agree with appellant, therefore, that the Court of Appeal erred in relying on cases in which an attempt was made to use the initiative to repeal

---

[15]*City of Woodlake* v. *Logan* (1991) 230 Cal.App.3d 1058 [282 Cal.Rptr. 27] and *City of Westminster* v. *County of Orange* (1988) 204 Cal.App.3d 623 [251 Cal.Rptr. 511] are not in point. In each the court invalidated a statutory initiative (Proposition 62) that would have amended the Government Code to subject local tax measures to the referendum. The court held in each that the initiative conflicted with article II, sections 9 and 11.

tax ordinances of general law cities and those in which the proposed measure would affect the authority of the legislative body over fiscal management under a budget already adopted by that body. An initiative which repeals taxes prospectively, i.e., one in which the repeal does not become effective until a subsequent fiscal year, is not the "functional equivalent" of a referendum. Our obligation to jealously guard the people's reserved right of initiative precludes the restriction on its exercise suggested by the *Myers* court and adopted here by the Court of Appeal.

## VI

### THE CHARTER OF THE CITY AND COUNTY OF SAN FRANCISCO

■ Because our prior decisions do not establish the invalidity of Proposition R, we must consider whether any provision of the San Francisco Charter precludes exercise of the initiative power in this manner. For the reasons stated above, it is clear that section 9.108 of the charter, which provides that ordinances levying taxes are not subject to the referendum, does not do so.

In construing the San Francisco Charter we begin with the established principle that all reasonable doubts must be resolved in favor of the people's exercise of the reserved initiative power. (*Brosnahan* v. *Brown, supra,* 32 Cal.3d 236, 241.) We have consistently recognized that the initiative power must be construed liberally so as to promote the democratic process established by inclusion of the initiative and referendum in the Constitution. (See *Legislature* v. *Eu* (1991) 54 Cal.3d 492, 501 [286 Cal.Rptr. 283, 816 P.2d 1309]; *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 341 [276 Cal.Rptr. 326, 801 P.2d 1077]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281]; *Associated Home Builders etc., Inc.* v. *City of Livermores, supra,* 18 Cal.3d 582, 591; *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 210, fn. 3 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973].) "[A]ll presumptions favor the validity of initiative measures and mere doubts as to validity are insufficient; such measures must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears." (*Legislature* v. *Eu, supra,* 54 Cal.3d 492, 501.) That obligation is no less weighty when the exercise of the power of initiative reserved in a city charter is challenged. (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, 147.)

As we have noted above, the initiative power reserved under the San Francisco Charter is extremely broad. Section 9.108, subdivision (a) of the charter reserves to the people the "power to propose by petition, and to adopt

or to reject at the polls, any ordinance, act or other measure which is within the power conferred upon the board of supervisors to enact."

Clearly the Board had the power to enact an ordinance repealing the utility tax or amending the existing ordinance to exempt residential utility users. On its face, therefore, charter section 9.108, subdivision (a) reserves to the people the same power.

Respondents' argument that Proposition R cannot be upheld as one authorized under charter section 9.108, subdivision (a) because it is, in fact, a "backhanded referendum," lacks merit since Proposition R operates prospectively only. While it was adopted midway in the calendar year, it did not have any impact on the collection of the residential utility tax during the fiscal year in which the Board had implemented the tax. Thus it did not result in an unbalanced current budget.

In arguing that use of the initiative in this manner is inconsistent with the exemption of tax measures from the referendum, respondents concede that the question is one of discerning the intent underlying the referendum and initiative provisions of the charter. They focus only on the intent underlying the referendum provision, however, and do not acknowledge the important distinction between suspending the operation of a newly enacted tax measure and the repeal of a tax that is to be effective in a subsequent fiscal year. As we have shown, the use of the charter initiative provision shortly after its adoption in attempts to both enact and repeal taxes confirms that no restriction on the initiative was implied in the referendum provision.

The San Francisco Charter contains no bar on use of the initiative to repeal a tax and thus presumably it was intended that it be used for that purpose, and its scope is consistent with the constitutional initiative power. The city and county itself does not contend otherwise and does not contend that the repeal of Proposition R impermissibly interfered with the authority of the Board over, and responsibility for, fiscal management. Proposition R did not suspend operation of a newly enacted ordinance. It was proposed several years after the utility tax ordinance was adopted by the Board and did not affect the current operation of the 1982 ordinance. There is no indication that another tax could not have been imposed to offset the revenue lost by the repeal of the residential utility tax. Therefore, the policy reasons for the limitation on subjecting tax measures to the referendum are not present and there is no basis for inferring that a limitation on use of the

initiative to repeal tax ordinances is inherent, although not expressed, in the initiative provision of the San Francisco Charter.[16]

Proposition R is not comparable to the proposed initiative ordinance under consideration in *Myers, supra,* 241 Cal.App.2d 237, 243, in which a Court of Appeal first declared that the initiative power may not be used as a "back-handed technique to invoke the referendum process" where that process is not available. Instead, Proposition R is a municipal equivalent of the statutory initiatives repealing the state gift and inheritance taxes upheld by the Court of Appeal in *Carlson* v. *Cory, supra,* 139 Cal.App.3d 724. There, too, it was argued that the initiative may not be used to circumvent the limitations on the referendum power. The court rejected the argument, noting that nothing in the Constitution prohibited use of the initiative to repeal tax laws. It found the reservation of the initiative power "to propose statutes . . . and to adopt and reject them" found in article II, section 8, subdivision (a), "clear and unambiguous." (139 Cal.App.3d at p. 731.) The language of the San Francisco Charter is, if anything, even more clear and unambiguous.

Respondents identify nothing in the charter that would have barred adoption of Proposition R had the board not already created a utility tax. Had the San Francisco voters been aware that such a tax was contemplated, their reserved power of the initiative could have been exercised to forestall adoption of the tax. That being so, it is not appropriate to invoke the policy, if in fact such a policy exists (see *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, 143), of resolving doubts as to the scope of the initiative power to avoid interference with the legislative body's responsibility for fiscal management.

Nor is Proposition R a measure that is beyond the scope of the initiative or referendum because its " 'inevitable effect would be greatly to impair or wholly destroy the efficacy of some other governmental power, the practical application of which is essential . . . .' " (*Simpson* v. *Hite* (1950) 36 Cal.2d 125, 134 [222 P.2d 225].) The impact of Proposition R was to preclude collection of $10 million in residential utility taxes in the fiscal year following its adoption. Appellant asserts that this figure represented only .625 percent of the city's general fund budget of $1.6 billion.[17] Although the Board concluded that the tax was necessary because of the "dire financial

---

[16]For that reason we need not consider appellant's additional argument that there is no constitutional justification for restricting the exercise of the initiative on an ad hoc basis on the ground that a particular initiative measure will impermissibly interfere with the fiscal management authority of the legislative body. Appellant argues that those decisions which have placed such limitations on the voters' exercise of their initiative power reflect a paternalism which lacks confidence in the electorate to use the initiative power wisely.

[17]Respondents do not question this figure.

straights" in which San Francisco found itself at the time the residential utility tax was imposed, it does not now argue that when regulation section 707.1 was adopted it had no source of replacement income.

It is respondents, not the City and County of San Francisco, who challenge the repeal of the tax and they make no effort to demonstrate that removing the tax on residential utility use from the city's budget substantially impaired the ability of the board of supervisors to carry out its charter responsibilities, including fiscal management.[18] Respondents also fail to identify any basis on which exercise of the initiative power to enact regulation section 707.1 could be found to conflict with other provisions of the San Francisco Charter.

We conclude, therefore, that the adoption of regulation section 707.1 by the voters of San Francisco was a permissible exercise of the initiative power.

## VII

### FUTURE TAX MEASURES

 Section 9.114 of the San Francisco Charter provides: "No initiative, ordinance or measure or declaration of policy approved by the electorate under the provision [*sic*] of this charter shall be subject to veto, or be amended or repealed except by vote of the electorate, unless such ordinance or measure shall otherwise provide."

Section 707.1 of the revenue/business regulations, in addition to repealing the residential utility tax, provides in subdivision (c) that it may be amended only by the voters. Respondents claim that this ban on future amendment by the legislative body is invalid. The subdivision is actually surplusage, however, and adds nothing to the effect of the initiative measure. Because regulation section 707.1 is an initiative measure, it is subject to section 9.114 of the charter. Therefore, like any initiative, either by virtue of the identical

---

[18]Amicus curiae Association of County Supervisors urges the court to recognize the difficulty in determining the fiscal effect of a tax repeal. The dissent and the association argue that the court should not become involved in the financial and political issues which permeate the budget process in local government. These concerns, while not without substance, are not relevant in construing the constitutional and charter provisions in issue here. The social and economic wisdom of an initiative provision which reserves to the voters the right to repeal tax measures is not a matter of concern. Our obligation is simply to evaluate the validity of the measure under the Constitution and charter. *(Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 814 [258 Cal.Rptr. 161, 771 P.2d 1247]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 219.)

constitutional limitation[19] or by virtue of the charter, may be amended or repealed only by the electorate.

The Court of Appeal, relying on *Hunt* v. *Mayor & Council of Riverside, supra,* 31 Cal.2d 619, and *Campen* v. *Greiner, supra,* 15 Cal.App.3d 836, concluded that regulation section 707.1 was invalid to the extent that it precluded amendment by the board of supervisors because it divested the board of its power to enact tax legislation. Appellant argues that the court erred in this respect also. We agree.

The decisions on which the Court of Appeal relied are not controlling. *Hunt* v. *Mayor & Council of Riverside, supra,* 31 Cal.2d 619, held only that neither the constitutional nor the city charter power of referendum could be used to subject a sales tax ordinance to a vote of the people. We concluded that the charter could not be construed as contemplating that the city council budget process would be hampered by the uncertainty as to revenue available from all sources and the consequent delay in its fixing the property tax rate that would occur if a major source of revenue such as the sales tax were subject to a referendum. (31 Cal.2d at p. 629.) The decision considered only the scope of the referendum power.

*Campen* v. *Greiner, supra,* 15 Cal.App.3d 836, in addition to improperly applying the *Myers* "backhanded referendum" rule to a charter city, held that the initiative's bar to any future imposition of a utility tax was invalid as an attempt to do by initiative ordinance something that could only be done by charter amendment. The city council could not restrict its own powers and the legislative powers of the electorate were no greater than those of the council itself. Therefore, the court reasoned, the only manner in which such a bar could be enacted was through amendment of the city charter.

The *Campen* court overlooked a fundamental aspect of the initiative power, one present in both the constitutional and, presumably, most charter initiative provisions. The people's reserved power of initiative *is* greater than the power of the legislative body. The latter may not bind future Legislatures (*City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 929 [120 Cal.Rptr. 707, 534 P.2d 403]), but by constitutional and charter mandate, unless an initiative measure expressly provides otherwise, an initiative measure may be amended or repealed only by the electorate. Thus, through exercise of the initiative power the people *may* bind future legislative bodies

---

[19]Article II, section 10, subdivision (c) of the Constitution provides: "The Legislature may amend or repeal referendum statutes. It may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval."

other than the people themselves. (*Kugler* v. *Yocum, supra,* 69 Cal.2d 371, 375, fn. 2; *Higgins* v. *City of Santa Monica* (1964) 62 Cal.2d 24, 30 [41 Cal.Rptr. 9, 396 P.2d 41].)

## VIII

### DISPOSITION

The judgment of the superior court directing issuance of a peremptory writ of mandate should be reversed and the petition denied. The judgment of the Court of Appeal is reversed.

Kennard, J., Arabian, J., and Werdegar, J., concurred.

**MOSK, J.**—I dissent. The majority are led to the wrong result by their reliance on inappropriate rules of construction and their hypertechnical analysis of what in essence is an uncomplicated question. In my view, equal parts of law and reason will yield the correct answer:

## I

The majority's first and principal ground of decision is deceptively simple. The majority observe the obvious—that although the referendum provisions of the California Constitution and the San Francisco Charter expressly exclude measures levying taxes from the referendum power, the initiative provisions of the same documents do not exclude those measures from the initiative power. To this self-evident premise the majority apply the rule that when the language of a statute (or constitution or charter) is clear, " 'its plain meaning should be followed.' " (*Droeger* v. *Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 38 [283 Cal.Rptr. 584, 812 P.2d 931].) Focusing exclusively on the initiative provisions, the majority conclude that because such provisions do not expressly exclude tax measures, their "plain meaning" is that they include such measures.

Although superficially attractive, the majority's reasoning does not withstand analysis. First, the purpose of statutory construction is not merely to declare the plain meaning of the words used; the purpose is to understand the intent of the lawmakers, and the goal of that inquiry, in turn, is to give maximum effect to that intent. "We begin with the fundamental rule that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; accord, *DuBois* v. *Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523,

853 P.2d 978]; *Woolsey* v. *State of California* (1992) 3 Cal.4th 758, 775 [13 Cal.Rptr.2d 30, 838 P.2d 758]; *Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; *Legislature* v. *Eu* (1991) 54 Cal.3d 492, 505 [286 Cal.Rptr. 283, 816 P.2d 1309]; *People* v. *Pieters* (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 918, 802 P.2d 420].) "[T]he intent of the Legislature is the end and aim of all statutory construction" (*Title Ins. & Trust Co.* v. *County of Riverside* (1989) 48 Cal.3d 84, 95 [255 Cal.Rptr. 670, 767 P.2d 1148]).

It is for this reason that although our inquiry begins with the words used by the lawmakers, it does not necessarily end by giving those words their plain or literal meaning. Rather, "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. . . . Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299] [construing Cal. Const., art. V, § 5, subd. (b)].) This is a well-settled rule. (See, e.g., *People* v. *King* (1993) 5 Cal.4th 59, 69 [19 Cal.Rptr.2d 233, 851 P.2d 27]; *People* v. *Broussard* (1993) 5 Cal.4th 1067, 1071 [22 Cal.Rptr.2d 278, 856 P.2d 1134]; *People* v. *Thomas* (1992) 4 Cal.4th 206, 210 [14 Cal.Rptr.2d 174, 841 P.2d 159]; *People* v. *Pieters, supra,* 52 Cal.3d 894, 898-899; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 401 [253 Cal.Rptr. 426, 764 P.2d 278]; *Webster* v. *Superior Court* (1988) 46 Cal.3d 338, 344 [250 Cal.Rptr. 268, 758 P.2d 596].) The same rule applies to constitutional provisions adopted by initiative. (E.g., *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) As we said seven decades ago in a case much cited since, " ' "While the intention of the legislature must be ascertained from the words used to express it, the manifest reason and the obvious purpose of the law should not be sacrificed to a literal interpretation of such words." ' " (*In re Haines* (1925) 195 Cal. 605, 613 [234 P. 883].) As will appear, the "plain meaning" rule is inadequate to give effect to the intent of the initiative and referendum provisions before us.

Also inadequate to the task is a second general rule of construction invoked by the majority, i.e., that because the provisions in issue involve the initiative and referendum they must be "liberally construed" in favor of the people's right to exercise those reserved powers. (*Legislature* v. *Eu, supra,* 54 Cal.3d 492, 501; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 219-220.) In appropriate cases this

rule is undoubtedly helpful; as will appear, however, to apply the rule here will result in defeating the intent of the framers. "We therefore adhere to the principle that the rule of liberal construction ' "should not blindly be followed so as to eradicate the clear language and purpose of the statute . . . ." ' " (*City of Huntington Beach* v. *Board of Administration* (1992) 4 Cal.4th 462, 472 [14 Cal.Rptr.2d 514, 841 P.2d 1034].) Specifically, "Although the initiative power must be construed liberally to promote the democratic process (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 219) when utilized to enact statutes, those statutes are subject to the same constitutional limitations and rules of construction as are other statutes." (*Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 675 [194 Cal.Rptr. 781, 669 P.2d 17]; accord, *Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 540 [277 Cal.Rptr. 1, 802 P.2d 317].) The same is true when, as here, the power is utilized to enact constitutional or charter provisions: our primary task remains to ascertain and effectuate the intent of the framers and of the electors who adopted those provisions.

Next the majority stress that the "only express constitutional limitations" on the statewide initiative power (maj. opn., *ante,* at p. 695) have nothing to do with taxes.[1] The majority then repeatedly emphasize the converse, i.e., that there is "no express exclusion" in the initiative provision for tax levies. (Maj. opn., *ante,* at pp. 694, 696.) Although they do not call it by name, the majority thus impliedly invoke a third general rule of construction—the maxim *expressio unius est exclusio alterius.* But this maxim, while also helpful in appropriate cases, "is no magical incantation, nor does it refer to an immutable rule. Like all such guidelines, it has many exceptions . . . . More in point here, however, is the principle that such rules shall always ' "be subordinated to the primary rule that the intent shall prevail over the letter." ' " (*Estate of Banerjee* (1978) 21 Cal.3d 527, 539 [147 Cal.Rptr. 157, 580 P.2d 657]; accord, *In re Joseph B.* (1983) 34 Cal.3d 952, 957 [196 Cal.Rptr. 348, 671 P.2d 852]; *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537].) " 'This rule, of course, is inapplicable where its operation would contradict a discernible and contrary legislative intent.' " (*In re Michael G.* (1988) 44 Cal.3d 283, 291 [243 Cal.Rptr. 224, 747 P.2d 1152].)

The inference drawn by the majority is further undermined by the fact that although there are only two *express* limitations on the constitutional initiative power (fn. 1, *ante*), the courts have recognized a number of important

---

[1]There are two express limitations: subdivision (d) of section 8 of article II of the Constitution bars an initiative on more than one subject, and section 12 of the same article bars an initiative that names any individual to any office or names any corporation to any power or duty.

*implied* exclusions from that power. Thus, as the majority note (maj. opn., *ante*, at p. 696, fn. 2), the constitutional initiative power cannot be used to mandate the Legislature to adopt a resolution (*American Federation of Labor v. Eu* (1984) 36 Cal.3d 687, 707-715 [206 Cal.Rptr. 89, 686 P.2d 609]),[2] nor can it be used to regulate the Legislature's internal operations (*People's Advocate, Inc.* v. *Superior Court* (1986) 181 Cal.App.3d 316, 324-327 [226 Cal.Rptr. 640]). The former use of the initiative conflicts with the implied limitation of that power which restricts it to the adoption of statutes and constitutional amendments (Cal. Const., art. II, § 8, subd. (a)), while the latter use conflicts with the express grant to the Legislature of the power to regulate its internal operations (*id.*, art. IV, §§ 7, subd. (a), 11). The majority further recognize (maj. opn., *ante*, at p. 698, fn. 4) that although city and county charter provisions—including initiative provisions—"are the law of the State and have the force and effect of legislative enactments" (Cal. Const., art. XI, § 3, subd. (a)), the Legislature may nevertheless bar the exercise of the charter initiative power over matters of statewide concern that it has delegated to a local legislative body (*Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 511-512 [247 Cal.Rptr. 362, 754 P.2d 708]).[3]

This court has recognized still other implied limitations on the initiative power. Thus although the Constitution expressly declares that it can be amended by initiative (art. XVIII, § 3), the initiative impliedly cannot be used to *revise* the Constitution. (*Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 350-355 [276 Cal.Rptr. 326, 801 P.2d 1077].) And because the Constitution expressly directs the Legislature to reapportion legislative districts once each decade following the federal census (art. XXI), the initiative impliedly cannot be used to achieve a second redistricting in the same decade. (*Legislature* v. *Deukmejian, supra,* 34 Cal.3d 658, 676.)

It follows that there is no bar to construing the initiative provisions of the Constitution and the San Francisco Charter to contain an implied exclusion for tax levies, if it is necessary to do so to give effect to legislative intent. The majority are led to the contrary conclusion because they make the basic error of viewing the initiative provisions of the Constitution and charter in isolation, without regard to the corresponding referendum provisions of those documents. Yet it is settled that " 'we do not construe statutes in

---

[2]We so held despite our express recognition of our duty to give the initiative provision a "liberal construction." (36 Cal.3d at p. 708.)

[3]Prior to the decision in *Committee of Seven Thousand* v. *Superior Court, supra,* 45 Cal.3d 491, numerous cases held that the initiative and referendum powers likewise do not extend to acts of a local legislative body that are administrative rather than legislative. (See *id.* at pp. 513-516, and cases cited (dis. opn. of Mosk, J.).) The San Francisco Charter expressly draws that distinction in the provision now before us. (§ 9.108, subd. (a).)

isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." ' " (*People* v. *Thomas, supra,* 4 Cal.4th 206, 210; accord, *DuBois* v. *Workers' Comp. Appeals Bd., supra,* 5 Cal.4th 382, 388; *City of Huntington Beach* v. *Board of Administration, supra,* 4 Cal.4th 462, 468; *People* v. *Hull* (1991) 1 Cal.4th 266, 272 [2 Cal.Rptr.2d 526, 820 P.2d 1036]; *Webster* v. *Superior Court, supra,* 46 Cal.3d 338, 348.) The same rule applies to constitutional provisions: "In construing the provisions of the Constitution each must be 'read in the context of the other provisions . . . bearing on the same subject. [Citation.] The goal . . . is to harmonize all related provisions if it is reasonably possible to do so without distorting their apparent meaning, and in doing so to give effect to the scheme as a whole.' " (*Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078, 1093 [240 Cal.Rptr. 569, 742 P.2d 1290]; accord, *County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 58 [233 Cal.Rptr. 38, 729 P.2d 202], and cases cited.)

The majority's failure to follow this principle is particularly egregious in the context of the initiative and referendum. The initiative and referendum provisions of the Constitution are, and have always been, not only related but inextricably linked. They entered the Constitution together as Senate Constitutional Amendment No. 22, adopted by vote of the people on October 10, 1911. First codified together in section 1 of article IV of the Constitution, they are now found in parallel and consecutively numbered sections (§§ 8 and 9) of the same article (art. II); a number of other provisions of the Constitution, moreover, still treat them together (art. II, §§ 10, 11; art. IV, § 1). The initiative and referendum provisions of the San Francisco Charter are likewise inextricably linked. They entered the charter together when it was revised in 1898 and they remain together to this day, now appearing in consecutive paragraphs of the same section (§ 9.108) of the charter; other provisions of the charter (§§ 9.109, 9.113, 9.115) also treat them as a unit. In each document, accordingly, the initiative and referendum provisions must be read together.

I begin with the Constitution. As the majority point out, the initiative provision is at least facially unlimited. By contrast, the referendum provision contains three express limitations on the constitutional referendum power: "The referendum is the power of the electors to approve or reject statutes or parts of statutes *except* [1] *urgency statutes,* [2] *statutes calling elections, and* [3] *statutes providing for tax levies or appropriations for usual current expenses of the State.*" (Cal. Const., art. II, § 9, subd. (a), italics added.) Each

of these limitations, in turn, is a general term incorporating a wide variety of laws that are exempt from the referendum power.[4]

The corresponding provisions of the San Francisco Charter make the point even more clearly. Again, as the majority observe, the initiative provision is facially unlimited. By contrast, the referendum provision is narrowly circumscribed, listing not three but eleven categories of laws that it expressly declares "shall not be subject to referendum." (§ 9.108, subd. (a), 5th par.) They are:

1. Annual budget ordinances.
2. Annual appropriation ordinances.
3. Supplemental appropriation ordinances.
4. The annual salary ordinance.
5. Ordinances amending the annual salary ordinance.
6. "The ordinances levying taxes."
7. Ordinances appropriating money from the emergency reserve fund.
8. Ordinances authorizing the city attorney to compromise litigation.
9. Ordinances necessary to enable the mayor to exercise public emergency powers.[5]
10. Ordinances reimbursing city employees for non-routine travel expenses pursuant to section 8.410 of the charter.
11. Ordinances relative to purely administrative matters.

A 12th exception—for all ordinances adopted as "emergency measures"—follows from a separate charter provision (S.F. Charter, § 2.304) declaring that such ordinances take effect immediately upon passage. They are therefore "not subject to the referendum provisions of this charter" (*ibid.*).

It follows that whatever the intent of each document with regard to the initiative provision, the framers clearly intended to place multiple substantial limitations on the scope of the referendum provision. We must give effect to that intent. There is no problem when a referendum is presented that violates one of those limitations: it is invalid on its face. (E.g., *Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 623-624 [191 P.2d 426].) The

---

[4]For example, "urgency statutes" are all laws that the Legislature finds necessary for the immediate preservation of the "public peace, health, or safety." (Cal. Const., art. IV, § 8, subd. (d).) Although a few measures are expressly excluded (*ibid.*), the Legislature traditionally takes a broad view of the equally broad categories of "public peace, health, or safety," and has found a wide range of statutes to be "urgent" within the meaning of the constitutional provision.

[5]I.e., the powers "to summon, organize and direct the forces of any department in the city and county in any needed service; to summon, marshal, deputize or otherwise employ other persons, or to do whatever else he may deem necessary for the purpose of meeting the emergency." (S.F. Charter, § 3.100, last par.)

problem arises when, as here, the case involves an attempt to use the *initiative* to repeal a measure expressly excluded from the scope of the referendum. The solution, I submit, lies in applying the well-known principle that the courts will not permit a party to do indirectly what the Constitution prohibits doing directly. This principle has long been recognized and applied by both the United States Supreme Court and this court. I shall review a representative sample of the cases.

Even before California entered the Union the foregoing rule was described in an opinion of the United States Supreme Court as "a just and well-settled doctrine" and "a great principle." (*Passenger Cases* (1849) 48 U.S. (7 How.) 283, 458 [12 L.Ed. 702, 775] (plur. opn. of Grier, J.).) There a Massachusetts statute required ship captains or owners to pay a tax on each foreign passenger disembarking in the state, for the support of foreign paupers. The United States Supreme Court held the statute violative, inter alia, of the provision of the federal Constitution which declares that "No state shall, without the consent of Congress, lay any duty of tonnage" (U.S. Const., art. I, § 10, cl. 3). No opinion commanded a majority, but in his plurality opinion Justice Grier reasoned that "It is a just and well-settled doctrine established by this court, that a State cannot do that indirectly which she is forbidden by the Constitution to do directly. If she cannot levy a duty or tax from the master or owner of a vessel engaged in commerce graduated on the tonnage or admeasurement of the vessel, she cannot effect the same purpose by merely changing the ratio, and graduating it on the number of masts, or of mariners, the size and power of the steam-engine, or the number of passengers which she carries. We have to deal with things, and we cannot change them by changing their names. Can a State levy a duty on vessels engaged in commerce, and not owned by her own citizens, by changing its name from a 'duty on tonnage' to a tax on the master, or an impost upon imports, by calling it a charge on the owner or supercargo, and justify this evasion of a great principle by producing a dictionary or a dictum to prove that a ship-captain is not a vessel, nor a supercargo an import?" (48 U.S. at p. 458 [12 L.Ed. at pp. 775-776].)

The principle was again invoked in *Cummings* v. *The State of Missouri* (1866) 71 U.S. (4 Wall.) 277 [18 L.Ed. 356]. At the close of the Civil War Missouri amended its constitution to require, inter alia, that clergymen take an oath swearing they had never engaged in armed hostility against the United States or given aid or comfort to persons so engaged. The United States Supreme Court held the Missouri constitutional provision to be an invalid bill of attainder (U.S. Const., art. I, § 10, cl. 1), i.e., a legislative act that inflicts punishment without a judicial trial. The high court reasoned that the challenged provisions of the Missouri Constitution would obviously have

constituted a bill of attainder if, for example, they had simply declared all clergymen guilty of armed hostility against the United States unless they did a specified act by a given day. "The difference between the last case supposed and the case actually presented is one of form only, and not of substance. The existing clauses presume the guilt of the priests and clergymen, and adjudge the deprivation of their right to preach or teach unless the presumption be first removed by their expurgatory oath—in other words, they assume the guilt and adjudge the punishment conditionally. The clauses supposed differ only in that they declare the guilt instead of assuming it. The deprivation is effected with equal certainty in the one case as it would be in the other, but not with equal directness. The purpose of the lawmaker in the case supposed would be openly avowed; in the case existing it is only disguised. The legal result must be the same, for what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name." (71 U.S. at p. 325 [18 L.Ed.2d at p. 363].)

In *Fairbank* v. *United States* (1901) 181 U.S. 283 [45 L.Ed. 862, 21 S.Ct. 648] a federal statute imposed an internal revenue stamp tax on export bills of lading, i.e., bills evidencing the sale of goods for export. The United States Supreme Court held the statute violated the prohibition of the federal Constitution declaring that Congress shall lay no tax on "articles exported from any state." (U.S. Const., art. I, § 9, cl. 5.) The high court reasoned that "a stamp tax on a bill of lading, which evidences the export is just as clearly a burden on the exportation as a direct tax on the article mentioned in the bill of lading as the subject of the export." (181 U.S. at p. 293 [45 L.Ed. at p. 867].) The high court relied on a similar decision invalidating a California stamp tax on bills of lading for gold or silver shipped out of the state (*Almy* v. *State of California* (1860) 65 U.S. (24 How.) 169 [16 L.Ed. 644]), saying, "that decision affirms the great principle that what cannot be done directly because of constitutional restriction cannot be accomplished indirectly by legislation which accomplishes the same result." (181 U.S. at p. 294 [45 L.Ed. at p. 867].)

Finally, in *Frick* v. *Pennsylvania* (1925) 268 U.S. 473 [69 L.Ed. 1058, 45 S.Ct. 603, 42 A.L.R. 316], a Pennsylvania statute levied an estate tax on the transfer by will of valuable tangible personal property owned by a Pennsylvania domiciliary but having its actual situs in New York. The United States Supreme Court held that Pennsylvania had no extraterritorial jurisdiction to tax such personal property and hence the tax was invalid under the due process clause of the 14th Amendment. Pennsylvania argued that even if it taxed only the property that the decedent owned in Pennsylvania it could take as a basis for calculating that tax the combined value of the decedent's

property in Pennsylvania and New York. Rejecting the argument, the high court reasoned: "this was but the equivalent of saying that it was admissible to measure the tax by a standard which took no account of the distinction between what the State had power to tax and what it had no power to tax, and which necessarily operated to make the amount of the tax just what it would have been had the State's power included what was excluded by the Constitution. This ground, in our opinion, is not tenable. It would open the way for easily doing indirectly what is forbidden to be done directly, and would render important constitutional limitations of no avail." (268 U.S. at pp. 494-495 [69 L.Ed. at pp. 1064-1065].)[6]

This court followed *Frick* v. *Pennsylvania, supra,* 268 U.S. 473, in *Perkins Mfg. Co* v. *Jordan* (1927) 200 Cal. 667 [254 P. 551]. There a California statute required each foreign corporation doing business in this state to pay an annual license tax on the total value of the corporation's authorized capital stock, without regard to the amount of either property owned or business done in this state. We held the statute violated the interstate commerce clause and due process clause of the federal Constitution. In rejecting inter alia the state's argument that the license fee was not a tax *on* the corporation's capital stock but was "simply measured by" that standard (*id.* at p. 679), we quoted with approval the foregoing refutation of a similar claim in *Frick* v. *Pennsylvania, supra,* 268 U.S. 473, 494-495 [69 L.Ed. 1058, 1064], including the explanation that " 'It would open the way for easily doing indirectly what is forbidden to be done directly, and would render important constitutional limitations of no avail.' " (200 Cal. at p. 679.)

In other decisions this court has invoked the same reasoning to reject attempts to evade direct prohibitions of the California Constitution. For example, in *Farrell* v. *Board of Trustees* (1890) 85 Cal. 408 [24 P. 868], a statute authorized the Board of Police Commissioners of the City of Sacramento to appoint policemen. We held the statute violated the prohibition of the Constitution against special laws "Creating offices . . . in . . . cities" (Cal. Const., former art. IV, § 25, subd. 28). Rejecting the argument that the

---

[6](Accord, *Cunningham* v. *Macon & Brunsw'k Railroad* (1895) 156 U.S. 400, 422 [39 L.Ed. 471, 477, 15 S.Ct. 361] [rejecting a contention that would allow a state to "do by indirection what the [state] constitution forbade her to do directly"]; *Bakery Drivers Local* v. *Wohl* (1942) 315 U.S. 769, 777 [86 L.Ed. 1178, 1185, 62 S.Ct. 816] (conc. opn. of Douglas, J.) [because of First Amendment protections of picketing, "a State is not free to define 'labor dispute' [by statute] so narrowly as to accomplish indirectly what it may not accomplish directly"]; *Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 137 [87 L.Ed. 1292, 1311, 63 S.Ct. 870, 146 A.L.R. 81] (dis. opn. of Frankfurter, J.) ["if a tax indirectly suppresses or controls the enjoyment of a constitutional privilege which a legislature cannot directly suppress or control, of course it is bad"].)

offices were not created by the statute but by the board of police commissioners, we said: "if the legislature cannot create an office by special act it certainly cannot accomplish the same thing through a special act which vests the power to appoint to such office in any board whatever. This would be a clear evasion of the constitution." (85 Cal. at pp. 416-417.) Two justices concurred on the ground that "by providing that additional policeman might be appointed by the city authorities, the legislature attempted to do indirectly, by a special statute, what it was forbidden to do directly" by the cited constitutional provision. (*Id.* at p. 417 (conc. opn. of Works, J., and Fox, J.).)

In *Dougherty* v. *Austin* (1892) 94 Cal. 601 [29 P. 1092], a statute authorized a county board of supervisors to hire a deputy county clerk whenever it deemed the county clerk to be insufficiently compensated. We held the statute violated the constitutional prohibition against increasing the compensation of county officers during their term of office. (Cal. Const., former art. XI, § 9.) We reasoned, "To construe this provision of the constitution so that a county clerk's salary could not be increased during his term of office, but that an act of the legislature would be valid which provided that all of his deputies, men whom he was bound to employ and bound to pay in the absence of such an act, should be paid by the county, independent of and in addition to the clerk's salary, would be to allow that to be done indirectly which could not be done directly, and would be establishing a medium for the practice of the very abuses which the constitutional provision was inserted to destroy." (94 Cal. at p. 632.)

In *Wood* v. *Riley* (1923) 192 Cal. 293 [219 P. 966], a section of the annual state budget bill provided that 1 percent of the amount appropriated for the support of teachers' colleges and special schools could be used instead to defray administrative expenses of the office of the state Superintendent of Public Instruction. The Governor vetoed this provision in the exercise of a then-recent constitutional amendment giving him the power to reduce as well as eliminate individual "items of appropriation" in the budget. (Cal. Const., former art. IV, § 34.) The Superintendent of Public Instruction argued that the budget provision was not a separate "item of appropriation" but merely a transfer, as a matter of bookkeeping, of funds already appropriated. Sustaining the veto, we looked beyond the form of the provision to its substance: "looked at in the light of what it was intended to accomplish, and what it would have accomplished if allowed to stand, one cannot escape the conviction that it worked an appropriation." (192 Cal. at p. 305.) We therefore concluded that to accept the superintendent's argument "would be to hold that the legislature might, by indirection, defeat the purpose of the constitutional amendment giving the Governor power to control the expenditures of the state, when it could not accomplish that purpose directly or by an express provision in appropriation bills." (*Ibid.*)

In *County of Los Angeles* v. *Riley* (1936) 6 Cal.2d 625 [59 P.2d 139, 106 A.L.R. 903], a statute provided that a portion of the motor vehicle license tax collected by the state would be appropriated to the counties for their use. We held the statute violated the constitutional provision prohibiting the Legislature from taxing cities or counties or their inhabitants for local purposes. (Cal. Const., former art. XI, § 12.) We reasoned: "It necessarily follows that the state cannot levy and collect a tax, which it has power to levy and collect for state purposes, and then appropriate a portion of the fund so collected to the cities or counties for purely local purposes. This would be to permit the state to do indirectly what it is prohibited from doing directly . . . ." (6 Cal.2d at pp. 626-627.)

In the foregoing cases it was a statute that attempted to do indirectly what the Constitution prohibits directly.[7] In the case at bar the conflict is between two constitutional (and charter) provisions—the referendum and the initiative. Again, however, the rule is the same.

Thus in *In re McGee* (1951) 36 Cal.2d 592 [226 P.2d 1], one constitutional provision (Cal. Const., former art. II, § 2½) conferred broad powers on the Legislature over the subject of primary elections.[8] Another constitutional provision, however, conferred on the Legislature apparently exclusive jurisdiction to determine the qualifications of its members: "Each house shall . . . judge of the qualifications, elections, and returns of its members." (Cal. Const., former art. IV, § 7.) We held that the latter prevails over the former, reasoning that "If the Legislature may, by authorizing court review of primary election contests, prevent a candidate from being on the ballot at the ensuing election for various defects as to the elections or qualifications, it would, in many situations, achieve indirectly what it could not do directly, that is, delegate to the courts its prerogatives under section 7 of article IV of the California Constitution." (36 Cal.2d at p. 598.)

As noted above, in *Legislature* v. *Deukmejian, supra,* 34 Cal.3d 658, we held that the constitutional initiative power cannot be used to reapportion legislative districts after the Legislature has once done so in the same

---

[7]The same rule applies when the attempt is made by means of an ordinance. (*Regents of University of California* v. *City of Los Angeles* (1979) 100 Cal.App.3d 547, 550 [160 Cal.Rptr. 925] ["the 'sewer facilities charge' remains as merely . . . one more attempt by a local taxing entity to accomplish indirectly what it cannot do directly"].)

[8]The cited constitutional provision declared in relevant part: "The Legislature shall have the power to enact laws relative to the election of delegates to conventions of political parties; and the Legislature shall enact laws providing for the direct nomination of candidates for public office, by electors, political parties, or organizations of electors without conventions, at elections to be known and designated as primary elections; also to determine the tests and conditions upon which electors, political parties, or organizations of electors may participate in any such primary election." (Cal. Const., former art. II, § 2½.)

decade. We began (at p. 669) by quoting with approval from *Wheeler* v. *Herbert* (1907) 152 Cal. 224, 237 [92 P. 353], to the effect that " 'The general rule in regard to constitutional limitations of this character is that that which cannot be done directly cannot be done by indirection.' " We rejected the contention that because the proposed second redistricting was to be achieved by initiative it was exempt from the constitutional command (art. XXI) of one redistricting per decade. We recognized the rule of liberal construction of the initiative power (34 Cal.3d at p. 675), but we held that rule must yield to the more fundamental principle of constitutional interpretation reiterated in *Wheeler* v. *Herbert, supra,* 152 Cal. 224, 237. We reasoned: "By 1911, when the California constitutional provision providing for the exercise of the initiative power was first adopted (former art. IV, § 1), the once-a-decade rule had already been clearly established. Nothing on the face of the initiative provision reflects either consideration of the use of the initiative to redistrict, or, if such use is permissible, an intent to exclude initiatives from the operation of the once-a-decade rule. . . . Well-established principles, applicable both to statutes and constitutional provisions, including constitutional provisions added by initiative, as was former section 1 of article IV [citation], require that in the absence of irreconcilable conflict among their various parts, they must be harmonized and construed to give effect to all parts. [Citations.] There being no contrary intent apparent and no repugnancy between former article IV, section 6, the predecessor of article XXI as heretofore interpreted, and article II, section 8 [the initiative provision], we conclude that the initiative process may not be used to do that which the Legislature may not do, to redraw legislative and congressional districts during the decade following a federal decennial census at a time when the Legislature has enacted a valid and effective statute or statutes defining those districts." (34 Cal.3d at p. 676.)

I apply the foregoing principle to the facts of this case. They are undisputed.

For a number of years prior to 1982 the Board of Supervisors (Board) of the City and County of San Francisco (City) had by ordinance imposed a tax on both residential and commercial users of certain public utilities within the City. The tax consisted of a levy of at least 5 percent on electricity, gas, water, steam, and telephone bills. The revenues generated by the tax were paid into the City's general fund.

In 1982 the Board enacted an ordinance exempting residential users from this tax for calendar year 1983; the ordinance also provided in effect that in each succeeding calendar year beginning with 1984 the tax *would* be imposed on residential users *unless* the Board renewed the exemption for such users by September 15 of the previous year.

In 1985 the Board did not renew the exemption for residential users, and the tax was therefore collected throughout 1986.

In 1986 the Board began by renewing the exemption, an action that would have suspended the tax for 1987. However, by an ordinance that took effect on April 27, 1987, the Board reversed itself and rescinded its prior exemption, thereby reimposing the tax for 1987.

On July 22, 1987, an initiative petition was filed with the City's registrar of voters seeking to repeal the tax. The initiative (Prop. R) declared that "No tax shall be levied" on residential utilities users in the City after June 30, 1988. Proposition R was adopted by the voters at the November 1987 election.

The Board did not renew the residential users' exemption in 1987, thereby reimposing the tax for the year 1988. The tax was nevertheless collected only until June 30, 1988; on that date the City's tax collector ceased collecting the tax as prescribed by Proposition R.

We need not speculate why Proposition R was presented to the voters when it was; the sole author of the initiative, state Senator Quentin L. Kopp, gave us the reason in his ballot argument, and it is wholly consistent with the foregoing sequence of events.[9] Declaring that it was time to end the residential utilities tax "once and for all," he stated his substantive objections to the tax and then explained: "That's why I fought the utility tax from the beginning of my service on the San Francisco Board of Supervisors in 1972. That's why I authored the 1982 ordinance to repeal the tax. The last one-year repeal recently expired and *the Board of Supervisors and the Mayor acted to reinstate the tax in April, 1987. And that's why I was forced to author Proposition R*, the Stop The Utility Tax Initiative." (Ballot Pamp., S.F. City & County, argument in favor of Prop. R (elec. of Nov. 3, 1987), p. 90, italics added.) In other words, although the author had long opposed the residential utilities tax, the passage of the ordinance rescinding the prior exemption and reimposing the tax on April 27, 1987, was the specific event that triggered the effort to repeal the tax "once and for all."

With this background it is plain to see what actually happened here. The opponents of the residential utilities tax wished to repeal the ordinance levying it, but they could not achieve their purpose by means of a petition

---

[9]We may consider the intent of the author of an initiative when, as here, there is reason to infer that the voters were made aware of it and believed the measure would achieve that purpose. (*Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 764-765, fn. 10 [274 Cal.Rptr. 787, 799 P.2d 1220].)

for referendum because both the Constitution and the San Francisco Charter expressly exclude tax levies from the referendum power. Accordingly, less than 90 days after the ordinance levying the tax took effect[10] the tax opponents presented instead a petition for initiative that indirectly achieved the same purpose: at the small cost of allowing the tax to be collected for the first six months of 1988, the opponents managed not merely to have the tax suspended for the following year—as had happened before—but to have it repealed "once and for all," i.e., forever.

The trial court took the same view of the tax opponents' technique. In explaining its decision to strike down Proposition R, the court pointed out that "first of all, if you just look at the sequence of events" it becomes clear what happened: "it is, of course, the fact that what happened here was that in April of 1987 the Board of Supervisors adopted a measure which lifted the residential exemption from the utility tax. They adopted that measure.

"And in the absence of the prohibition against such a referendum, that would have been tested by popular vote by a referendum. That was the measure that the Board of Supervisors adopted. It is being challenged by a group of citizens.

"If you bring a referendum and you put it on the ballot, and if it is passed, as Proposition R did, you set aside the measure that was adopted in April 1987.

"Well, obviously, they could not do that. *The Constitution clearly prohibits such a referendum. And, so, realistically, what happened was the proponents of this point of view instead put an initiative on the ballot to have exactly the same effect*, and to restore the residential exemption that the Board of Supervisors had just removed." (Italics added.)

The initiative in question was thus the functional equivalent of a referendum. Yet as we have seen, "The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name." (*Cummings v. The State of Missouri, supra*, 71 U.S. 277, 325 [18 L.Ed. 356, 363].) The tax opponents well knew that both the Constitution and the San Francisco Charter barred the use of the referendum to repeal the tax imposed by the ordinance of April 27, 1987; they therefore achieved the same result by use of the initiative. To allow that maneuver to succeed simply because the initiative provisions do not expressly exclude tax levies from their wording would be to "open the way·for easily doing indirectly what is forbidden to be

---

[10]The parties stipulated that although the tax was reimposed on April 27, 1987, it was not in fact collected at any time during 1987.

done directly, and would render important constitutional limitations of no avail." (*Frick* v. *Pennsylvania, supra,* 268 U.S. 473, 495 [69 L.Ed. 1058, 1065]; *Perkins Mfg. Co.* v. *Jordan, supra,* 200 Cal. 667, 679.)

## II

The majority's second ground of decision, intermingled with the first, is that "An initiative which repeals taxes *prospectively,* i.e., one in which the repeal does not become effective until a *subsequent fiscal year,* is not the 'functional equivalent' of a referendum." (Maj. opn., *ante,* at p. 711, italics added.) This theory of "prospective repeal" likewise does not withstand analysis.

To begin with, the theory rests on a questionable legal basis. It implies that "the functional equivalent of a referendum"—and hence the referendum itself—can be used to repeal a tax measure provided that "the repeal does not become effective until a subsequent fiscal year." There is no authority for this exception to the constitutional and charter limitations on the referendum power. It is true that the constitutional referendum provision excludes statutes providing for "tax levies or appropriations for usual current expenses of the State." (Cal. Const., art. II, § 9, subd. (a).) But we have never decided whether the phrase, "for usual current expenses of the State," modifies only "appropriations" or also modifies "tax levies." We expressly left that question open in *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 836 [313 P.2d 545], footnote *, and we have not answered it in the ensuing four decades. We noted in *Geiger,* however, that the Legislative Counsel concluded that the phrase, for "usual current expenses of the State," does *not* modify "tax levies," explaining that "This conclusion was based on the ballot argument, on contemporaneous construction at the 1913 session of the Legislature, and on the continuous practice of making state taxes effective immediately regardless of use of the proceeds therefrom *for capital outlay as well as usual current expenses.*" (*Ibid.,* italics added.) Indeed, the reason last given suggests that the phrase, "usual current expenses," may well have been intended not to distinguish expenses incurred in the current fiscal year from those incurred in a later fiscal year, but to distinguish operational expenses from capital outlay in any fiscal year. The term "current expenses," of course, bears both meanings.

By contrast, it is clear that the referendum provision of the San Francisco Charter cannot be read as the majority imply. That provision simply declares, "the ordinances levying taxes . . . shall not be subject to referendum." (§ 9.108, subd. (a), 5th par.) Significantly, it does not limit its prohibition to ordinances levying taxes "for current expenses of the city," let

alone ordinances levying taxes "collected in the current fiscal year" or "reflected in the current city budget." When the issue is whether a measure violates a provision of a city charter, as here, "We begin with the cardinal principle that the charter represents the supreme law of the City, subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law." (*Domar Electric, Inc.* v. *City of Los Angeles* (1994) 9 Cal.4th 161, 170 [36 Cal.Rptr.2d 521, 885 P.2d 934].) "Any act that is violative of or not in compliance with the charter is void." (*Id.* at p. 171.) Whatever the meaning of the phrase, "for usual current expenses of the State," in the constitutional provision, it does not conflict with or preempt the plain and unqualified language of the charter provision. That provision, accordingly, does not support the majority's "prospective repeal" theory.

In any event, the majority's theory clashes with fiscal reality. Cities—especially large cities like San Francisco—need to plan their finances farther in advance than merely the current fiscal year. They must be able, for example, to project their revenue sources and levels sufficiently into the future to ensure that they can not only meet the annual demands of municipal government but can also safely undertake numerous longer-term obligations, such as the servicing of bonds and the funding of multiyear employee contracts, ongoing social programs, and major civic repair and construction projects. The majority's "fiscal year" limitation would permit those legitimate needs to be frustrated at will.

The point is illustrated by the facts of the case at bar. The majority repeatedly assert that Proposition R was merely "prospective" because it repealed the City's residential utilities tax as of June 30, 1988, i.e., as of the start of the next fiscal year. But at least since it rewrote the measure in 1982, the Board always imposed this particular tax not on a fiscal year basis but on a calendar year basis. (S.F. Mun. Code, §§ 703-706.1.) We must assume that the Board knew it had done so and took this fact into account in its budgetary process. By declining to renew the residential users' exemption on or before September 15, 1987, the Board reimposed the tax *for the entire year 1988*. The tax collector duly began to collect the tax on January 1 of that year, but was compelled to stop collecting it on June 30, 1988. The effect of Proposition R, accordingly, was to cut off this revenue flow in midstream—in the middle of the 12-month period for which the Board had imposed the tax and planned on its collection. Just as the trial court viewed the true nature of Proposition R "realistically," so too we must conclude that, realistically, the effect of Proposition R was not merely "prospective."

Next, the majority's theory also posits that an initiative that repeals a tax measure is not an invalid functional equivalent of a referendum provided

that it does not "impermissibly interfere with fiscal management" of the city or county that imposed the tax. (Maj. opn., *ante*, at p. 710.) The majority derive this language from *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 143 [130 Cal.Rptr. 465, 550 P.2d 1001], and the cases there cited, where it appears in a different context.[11] Without authority, however, the majority then expand the inquiry into the very heart of local fiscal management: an initiative repealing a tax impermissibly interferes with such management, say the majority, "if the repeal [1] eliminates a major revenue source and [2] no other revenue source is available that may be tapped to offset a resulting budget deficit or to avoid future deficits." (Maj. opn., *ante*, at p. 710.)

Not only is there no authority for this further exception, but its implementation will produce at least two untoward consequences. First, it will require courts to invade the province of local government authorities and make determinations that courts are ill-equipped to make.[12] Many of these decisions are not traditional questions of fact but complicated matters of political judgment and legislative compromise that are particularly within the expertise of local government authorities. To compel the courts to make such

---

[11]In *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245 [279 Cal.Rptr. 325, 806 P.2d 1360], we upheld the use of a statewide initiative to increase a *statewide* excise tax, and in *Carlson* v. *Cory* (1983) 139 Cal.App.3d 724 [189 Cal.Rptr. 185], the Court of Appeal upheld the use of a statewide initiative to repeal the *statewide* inheritance and gift taxes. But as that decision correctly observed, "Unlike local bodies whose power to tax is more limited, the state Legislature has broad powers to tax as well as considerable discretion to limit spending in order to achieve a balanced budget." (*Id.* at p. 730.) In *Birkenfeld* v. *City of Berkeley, supra*, 17 Cal.3d 129, 143, we recognized that a different rule has developed to govern the use of *local* initiatives to repeal *local* taxes: "The governmental power that it is asserted the [local initiative in question] would impair is the city council's power to raise tax revenues to carry on the municipal government. Past decisions invalidating initiative or referendum measures to repeal local tax levies have indicated a policy of resolving any doubts in the scope of the initiative or referendum in a manner that avoids interference with a local legislative body's responsibilities for fiscal management." In the case at bar I would likewise resolve our doubts in a manner that avoids interference with the Board's responsibilities to fund the municipal government of San Francisco.

[12]For example, when is a lost revenue source "major"? When it produces 10 percent of the local government's overall revenue? Twenty percent? Forty percent? The majority do not tell us. Even the concept of "revenue source" in this context is more complex than the majority seem to realize. What are the "other" sources that the local government may tap? Since the passage of Proposition 13 in 1978, local governments have developed many more revenue sources than the traditional property and sales taxes with which the courts are familiar. And when is such a source "available"? It may well be contingent on other events, such as a favorable vote of a majority or even a supermajority of the local electors, or compliance with conditions for receiving state or federal revenue sharing, matching funds, block grants, etc. When will such other revenue source be needed to "offset" a resulting budget deficit? Deficits may be offset by lowering expenditures as well as by raising revenues. And such questions multiply, of course, when the issue is whether the revenue source is available "to avoid future deficits."

determinations will at best disrupt local legislative and executive operations, and at worst impinge on the doctrine of separation of powers. Second, while these matters are being subjected to the costs and delays of litigation, trial, and appeal, local government authorities will remain uncertain of their ultimate revenue sources and hence unable to engage in the above discussed long-term financial planning necessary to sound fiscal management of cities and counties. For these reasons the bright-line rule proposed above (pt. I, *ante*) will better serve the important interests at stake than the case-by-case, ad hoc determination required by the majority's theory.

This point, too, is illustrated by the case at bar. The City's controller estimated that if Proposition R passed, the City would suffer a revenue loss of approximately $10 million each year thereafter. The majority dismiss that sum as insignificant, comparing it to the City's overall budget. But surely the significance of a $10 million annual revenue loss by the City is a political rather than a judicial judgment. The need is undisputed: the parties stipulated, for example, that responsible City officials estimated it would cost $150 million more in fiscal 1992-1993 to provide the same level of municipal services provided in fiscal 1991-1992. In these circumstances it is not for this court—or any court—to say that a $10 million annual reduction in revenue is not a "major" loss to the City.

The majority compound the error by repeatedly asserting that "The city and county itself does not contend . . . that the repeal of Proposition R impermissibly interfered with the authority of the Board over, and responsibility for, fiscal management." (Maj. opn., *ante*, at p. 712; see also *id.* at pp. 707, fn. 12, 714.)[13] The record is otherwise. The City can speak only through its elected representatives, principally the mayor and the Board. Although they are not formally parties to this lawsuit, the mayor and the Board have directly addressed this question and have made it clear that—contrary to the majority's assertion—they believe that Proposition R will indeed interfere with the fiscal management of the City. Thus in the lead argument of the ballot pamphlet against Proposition R, Mayor (now United States Senator) Dianne Feinstein stated in part that "The utility tax is used to pay for essential city services. It goes into the General Fund which pays for your

---

[13]The majority also repeatedly stress that "It is respondents [taxpayers], not the City and County of San Francisco, who challenge the repeal of the tax . . . ." (Maj. opn., *ante*, at p. 714; see also *id.* at p. 707, fn. 12, 710].) But a taxpayer's action is entirely appropriate here. (See, e.g., *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000].) By contrast, it would have been inappropriate for the City to initiate this suit: Proposition R enacted a provision of the City's own code (S.F. Mun. Code, § 707.1), and the City cannot be expected to sue itself. The named defendant was sued in his official capacity as the City's tax collector, and has been represented throughout these proceedings by the office of the city attorney.

direct services. For example, the $10 million from this tax amounts to 143 police officers or 135 firemen or 200 nurses. These revenues represent over half of the public library's entire budget! [¶] The arithmetic of this measure is simple—eliminating the tax means reduced services. The loss of tens of millions of federal and state revenues in recent years make this nominal tax all the more important in serving the needs of San Franciscans. Without it, services will be cut, take my word for it. We all know that inflation and salary standardization adds about $60 million to the budget. The utility tax is essential to meeting these new and inevitable costs and will be crucial for whomever next is Mayor if he or she is to balance the budget. The utility user tax became critical when Proposition 13 froze property taxes." (Ballot Pamp., S.F. City & County, argument against Prop. R (elec. of Nov. 3, 1987), p. 91.)

Immediately after the mayor's views the Board presented its own official argument against Proposition R, stating in part that "Your No vote on Proposition R will let us continue to provide important City services. The ten million dollars from this tax help support police and fire services, City hospitals and other critically needed services. If this tax is removed, services will be cut." (Ballot Pamp., S.F. City & County, argument against Prop. R (elec. of Nov. 3, 1987), p. 91.) Numerous City officials then made similar arguments emphasizing that the $10 million annual revenue loss caused by Proposition R will have serious adverse effects on vital City services.[14] Again, these are political judgments with which the courts should not interfere.

As for the second branch of their new test, the majority simply assert that "There is no indication that another tax could not have been imposed to offset the revenue lost by the repeal of the residential utility tax." (Maj. opn., *ante*, at p. 712.) There is no such "indication," of course, because this was not an issue in the case until now, and the parties therefore had no reason to address it. In any event, it is improbable that "another tax could . . . have been imposed" as easily as the majority imply. New or increased property taxes were not an option, of course, because the passage of Proposition 13 had effectively frozen property tax assessments and rates. And after the passage of Proposition 62 in 1986, a city or county could impose new taxes only with the approval of the voters: it could impose a new general purpose tax only if the ordinance proposing it was approved by a two-thirds vote of the local legislative body (Gov. Code, § 53724) and the measure was then

---

[14]Those officials included, for example, Chief of Police (now Mayor) Frank M. Jordan, the fire chief, the general manager of the Public Utilities Commission, and directors of a number of the City's service agencies. (Ballot Pamp., S.F. City & County, arguments against Proposition R (elec. of Nov. 3, 1987), p. 92.)

approved by a majority of the electors voting on it (*id.*, § 53723); if it was a special purpose tax, it had to be approved by a supermajority of two-thirds of those voting on it (*id.*, § 53722; see also Cal. Const., art. XIII A, § 4). In 1987 the voters of San Francisco had just voted in favor of a measure—Proposition R—that *repealed* a tax that supported general city services; it is highly unlikely they would have turned around and voted to *enact* another tax to replace it.

### III

Although the majority say they have no need to look beyond the "plain meaning" of either the constitutional or the charter initiative provision in this case, they nevertheless rely on what they characterize as "legislative history" of the constitutional provision in order to "confirm" their reading of it. (Maj. opn., *ante*, at pp. 699-702.) The majority concede, as they must, that the ballot pamphlet for the statewide measure that added the initiative and referendum to the Constitution in 1911 was silent as to the subject matter of the new initiative power: in particular, the ballot pamphlet did not tell the voters they would be able to repeal by initiative tax laws they were expressly forbidden to repeal by referendum. The majority are therefore compelled to rely on the fact that in the decade following the adoption of the 1911 constitutional initiative several amendments were proposed that purported to bar or make more difficult the use of the initiative in matters of taxation. The majority infer that these proposed amendments "would have been unnecessary if the initiative could not be used to enact and repeal tax legislation." (Maj. opn., *ante*, at p. 700.) There is less here, however, than meets the eye.

The amendment proposed in 1917 would have barred the use of the initiative to adopt or repeal any law relating to tax levies or assessments. It was introduced, however, by a single legislator in response to a failed initiative that would have allowed the state to tax only increases in real property assessments and would have repealed all other taxes—i.e., the "single tax" theory of Henry George. The measure was apparently a reaction—or perhaps an overreaction—to that drastic proposal: according to its proponent, its purpose was to " 'save the State from the Single Tax.' " (Hichborn, Story of the Session of the Cal. Legislature of 1921 (1922) p. 189 [hereafter Hichborn].) In any event, the proposal died a quick death in committee (*id.* at p. 190).

The 1919 measure did not propose to forbid all tax-related initiatives, but rather to raise the number of signatures needed to qualify such measures from 8 percent to 25 percent of the voters. Its primary motivation, however, appears to have been the desire of "underworld interests" to have "prizefighting made immune from initiative attack." (Hichborn, *supra*, at p. 194.)

The proposal never emerged from the Legislature. The proponents of the 1920 measure bypassed the Legislature and put it on the ballot by initiative; its terms, however, were identical to the failed 1919 measure, and it was defeated at the polls. The 1922 measure likewise did not propose to forbid all tax-related initiatives, but to fix the number of signatures required for such initiatives at 15 percent of the voters; it, too, was defeated at the polls.

None of these proposals, obviously, focused on the precise issue raised by the case at bar; in particular, none had anything to do with local initiatives and local taxes. All, moreover, were unsuccessful. Proposals to amend statutory or constitutional provisions can be, and often are, motivated by a variety of purposes; some may be express, but others may be unstated or even unformed. And some proposals may be motivated by a single purpose, while others may serve different purposes in the minds of different proponents: there may well be more than one ax to grind. For these reasons it is difficult enough to infer the intent of legislation from *successful* efforts to amend it; it is usually impossible to infer the meaning of *unsuccessful* efforts, like those cited here by the majority. We have often observed that "Unpassed bills, as evidences of legislative intent, have little value." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396 [241 Cal.Rptr. 67, 743 P.2d 1323], and cases cited.) The same is true of unpassed constitutional amendments.

In the course of discussing the foregoing proposed amendments, the majority also quote a number of statements in which the speakers opposed the amendments on the ground they would assertedly have the effect of depriving the voters of the use of the initiative to "control taxation." These broad statements, however, were evidently made in the heat of hard-fought political campaigns as a general defense of the constitutional initiative power, and they do not focus on the particular issue in the case at bar. Under the rule of *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371], remarks of individual opponents of failed ballot measures in such circumstances carry little if any weight. This is a far cry, for example, from relying on the views of a delegate to a constitutional convention actually expressed on the floor of the convention during the debates and preserved in the official record. (See, e.g., *Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327, 364, fn. 20 [27 Cal.Rptr.2d 613, 867 P.2d 724].)

IV

Finally, the Court of Appeal relied on a long line of decisions beginning with *Myers* v. *City Council of Pismo Beach* (1966) 241 Cal.App.2d 237, 243

[50 Cal.Rptr. 402], that apply or recognize the rule that "A proposed initiative ordinance cannot be used as an indirect or backhanded technique to invoke the referendum process against a tax ordinance . . . ." The majority devote much space (maj. opn., *ante*, at pp. 705-710) to an effort to distinguish these decisions on various grounds. I shall not lengthen this opinion by entering that debate, however, because I believe the *Myers* rule is supported in any event by the above discussed "great principle" (*Fairbank* v. *United States, supra*, 181 U.S. 283, 294 [45 L.Ed. 862, 867]) that what the Constitution prohibits directly cannot be done indirectly. On that ground I would affirm the judgment of the Court of Appeal.

Lucas, C. J., and George, J., concurred.